IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA

Christopher (Bruce) The Living Man
Elizabeth (Bruce) the living woman                     Case #
    Plaintiffs
v.

William A. Price
William Kelly
Carol Egly
Jeanne Vaudt
Robert J. Blink
Anastasia Hurn
Emily Nieman
Stephanie Rhinehart
Katie Gosch
Linda Lane
John P. Sarcone
Jesse Ramirez
Kevin Bell
Stephanie Brown
Kevin J. Brownell
Grant Dugdale
Katherine Miller-Todd
Jake Lancaster
Alyssa Wilson
Gary Bellinghausen
Jeanne Munson
Kyle Thies
Newbury Living
Nancy Elscott
The Des Moines Register (U.S.A. Today)
Darren Tromblay
Jeffrey Pitts
Dale Mays
Paul White
Lucas Taylor
Ashley Cronbaugh
Anthony Reed


    Defendants

Christopher the Living Man AND Elizabeth, the living woman give affidavit to the court concerning the matter of these defendants in this civil claim:

## JURISDICTION

The court shall have jurisdiction, in that this Claim is a federal question case, being brought under and through Federal Codes 18 U.S.C. 1341 (Fraud); 42 U.S.C. §1983; (Deprivation of the claimants' rights using color of law), under 18 U.S.C. §1961 (The RICO Act. Concerning this matter, RICO will define a criminal organization operating under the guise of leadership on the state, county and city levels.) and under 18 U.S.C. §241, (Conspiracy against the claimants' unalienable and civil rights) and will also address the violations of the claimants' 5th Amendment right (due process of law,) claimant Christopher's 1st Amendment right (in the attempted deprivation of the claimant's right to free speech), claimant Christopher's 6th Amendment right (in the deprivation of his right to represent himself in a court of law without the need of a licensed BAR attorney and for the denial of his compulsory right to obtain witnesses in his favor, ); and the violation of Christopher's 8th Amendment right (against unreasonably or excessive high bonds/bails/fees without good cause being brought against him without good cause), rights all guaranteed these claimants, as they are residents of the Republic; by the Constitution for the united States of America. The claimants also intend to show a conspiracy against their civil, due process, Constitutional, unalienable and God Given rights, and thereby intend to also prove that a RICO organization of the defendants, on varying levels and at varying times, involving varying sets of only some of the defendants, and intend, by and through the afore-mentioned conspiracy against the claimants' rights, will prove the organization is in force and does exist.

The plaintiffs realize that 1983 actions and others intended here have a 3-year or less statute of limitations, but the claimants intend to show just cause as to why these actions should be heard and brought against certain defendants, regardless.

The plaintiffs also bring this action against the majority of the plaintiffs by and through Federal code 28 U.S.C. §4101; for libel, slander and defamation of character; and against others utilizing Federal code 18 U.S.C. §1201, for unlawful felony Kidnapping; and by utilizing 8 U.S.C. § 1234c against others; for the crimes of altering legal and court documents and also falsifying the record of these courts.  As to the Statute of limitations concerning the deprivation of rights using color of law, i.e. 18 USC 1983, the defendants afore named, utilizing color of law, and their corrupt courts of Iowa, utilized a number of unlawful ways to extend that time out from under the Statute of Limitations; (by the appellate courts, first, taking nearly a year and a half to decide the matter of the claimants unlawful termination of their parental rights, and 2nd in and through unlawfully and without cause, jailing plaintiff Christopher unmercifully and excessively in a 2 year period; and in  so doing also raising his bail and bonds so unlawfully high so that there was no reasonable or attainable solution for his to be released; and giving him a year's sentence in the Polk County Jail, using fabricated charges and totally depriving him of any defense).  The claimants ask the court to give the claimants leniency concerning this statute, a.  Because the violation of these rights by all the defendants run the course of 8 cases and 4 years; and b.  Because the actors have utilized unlawful means to push themselves behind that statute's line; and c.  in considering the massive amounts of damages these claimants have endured at the hands of these criminal defendants.

3

As to the matter of Fraud upon the court, practiced and implemented by nearly ALL of the defendants at varying times, the claimants state that there is no statute that limits this action.


## VENUE

Since almost all the events in this Claim happened in the city of Des Moines, Iowa and in the county of Polk; and since nearly all of the defendants reside in the same; venue is in the Southern District of Iowa.

## THE PLAINTIFFS

The Plaintiffs, hereinafter known as "Christopher, The Living Man," "Elizabeth, The living Woman," "claimant", "claimants", "plaintiff" or "plaintiffs," "C.B.," "E.B.," "Claimant Christopher," "Claimant Elizabeth," "Plaintiff Christopher", "Plaintiff Christopher" are naturalized sovereign nationals of the State of South Dakota at present, and all rights they are unalienably and Constitutionally guaranteed are invoked and reserved in this action, as they are sui juris and pro per litigants; and fall under and are protected under The Constitution for the united States of America, and the Republic. They are in possession of a NAC address, not herein listed, that shows them to not be resident aliens that have been trafficked out of the country or ex-patriated; but are true residents of the Republic. During the course of these events, the claimants also resided in the same county and state as the defendants until March of 2017. Crimes alleged against plaintiff Christopher were brought by Polk County, Iowa, and the alleged charges would all be stated to originate in Polk County, Iowa. The claimants have also, on several occasions, filed rescindment; to all signatures and agreements entered into unknowingly without full disclosure; concerning several documents issued them over the years (their birth certificate, their Iowa DL's, their contractual business State "marriage license," which names the State as their primary business partner and interest in the claimants' business agreement and affairs, and their U.S. social security cards and CUSIP numbers, which were applied for without full disclosure of the conditions for doing so by their lawful and biological parents without the claimants knowledge or their lawful ability, at the age presented these conditions, were they able to consent), and have duly and lawfully disagreed and denied all consent, both real and implied, to be identified as UNITED STATES Citizens, per the Constitutional definition of the 14th Amendment; an amendment in no way ratified by the several states of the Republic, nor its residents.

## THE CLAIM

1.  On July 17th, 2014, Defendant Emily Nieman, utilizing color of law and did act, using her unlawful and alleged power as a "State of Iowa Department of Human Services employee" and in the company of another unidentified woman operating under these same conditions, came to the residence of C.B. and E.B. E.B. answered the door, as C.B. was not currently home and was out looking for work. E.B. invited them in, in order to be compliant, since they were utilizing color of law to deceive her into thinking she had to let them enter. These two women stated that there had been a call made to them by an anonymous reporter, alleging that T.B., E.B.'s biological property, was not being fed or cared for by the claimants, and that the claimants were alleged to be dealing and doing drugs in their apartment. Claimant E.B. talked

with the women for around a half an hour, when C.B. also arrived.  Claimant C.B. knew who had reported them and why, and told the women that it was all lies, because the caller had been upset that C.B. had kicked her and her husband out of their home.  After another half an hour, and after the plaintiffs had explained everything, the two women stated that everything was fine, and that the allegations were unfounded, obviously; and thy left.  They handed both the claimants a drug testing appointment card and asked the claimants in they wouldn't mind drug testing, to alleviate the allegation concerning drugs.  Both claimants readily agreed to take the test for them, and the women then left.

2.   The following morning, on July 18th, around 17 hours following the interview with these same two women, which did include defendant Nieman; and claimants C.B. and E.B., (Ms. Nieman would later testify in the removal hearing a few days later, that T.B. was in "imminent danger" with C.B. and E.B., yet left T.B. in this alleged "imminent danger", with the claimants in their home, after stating that all was well, that the reporter was acting vindictively, that the caller was evidently lying about the claimants, and then, left the premises and T.B in the same imminent danger for an additional 17 hours; according to Ms. Nieman's charge and 21 day assessment, and according to the Petition for temporary Removal, authored by Defendant Stephanie Brown – before their return a day later this day) on July 18, 2014, after C.B. had left to go and find work, the two ladies returned to the residence of C.B. and E.B. and stated to E.B. that she would need to prepare her baby, gather up a bag of necessities, and come with them to the hospital, where T.B. would be checked out by a doctor.  E.B., believing that she would only need necessities for no more than an hour, packed 2 diapers and a bottle into her diaper back, prepared the baby, and went with them.

3.   Upon their arrival at Methodist Hospital in Des Moines, Iowa, T.B. was seen by an Emergency doctor.  Upon completing her exam, the doctor had found absolutely nothing out of the ordinary and claimed the baby was healthy, and yet they checked T.B. into the hospital anyway, without E.B.'s knowledge that they had done so and who did not consent to this in any fashion.

4.   Upon waiting another 2 hours after the first exam with E.B. in the waiting room, E.B. asked the two women what was taking so long.  Defendant Nieman informed E.B. that they were waiting for more doctors to look T.B. over again.

5.   Upon completion of an examination of T.B. by (supposedly) 3 more doctors, all 3 would (supposedly) come to the same conclusion as the Emergency Doctor and stated that T.B. was well fed (and weighed MORE then what should have been normal for her), and healthy, yet Ms. Nieman would decide and order them to keep T.B. as a patient at Methodist Hospital for 72 hours, a power allegedly granted her per an unconstitutional Iowa Statute, which allegedly granted Ms. Nieman the power to do so.  E.B. was not ever informed of the true length of the stay, and Ms. Nieman lied to E.B. and told her that T.B. was checked in, and that she would have to remain overnight, allegedly to await test results, another untruth.  E.B. informed Ms. Nieman that she had brought nothing with her that covered her for an overnight stay with T.B (i.e. extra diapers, clothes, food, etc.) and asked if she could go home to get these things, also mentioning that her dog had not been out for 4 hours, and wasn't sure when Claimant Christopher would get home.  Ms. Nieman told E.B. that, if she left T.B. in the hospital at that time, E.B. would, effectively, be reported as abandoning T.B. at the hospital, and that she

shouldn't leave.  15 minutes later, Ms. Nieman then offered E.B. a ride home in her car, against everything she had stated a few minutes earlier.

6.  Ms. Nieman then drove E.B. home, and on the way, E.B. volunteered to do her drug test, since the facility was on her way home, and not far from her home.  Ms. Nieman drove her to this facility, and left E.B. there, with no way to get home, and no way to return to the hospital.

7.  C.B. arrived at home just minutes before E.B. returned home, and she informed him what was happening, and that she wanted to eat, take a shower, gather some clothes, stated that she would have to stay at Methodist overnight; and asked C.B. for $2 so that she could get there on the bus.  E.B. finally returned to the hospital approximately 4 to 5 hours after Ms. Nieman had given her a ride.  Both Ms. Nieman and the hospital would report that E.B. had left her daughter at the hospital by herself for that amount of time, to do things that were not important at all, making E. B. appear to have her priorities mixed up and neglectful of T.B.

8.  On the Morning of July 19th, 2014, Claimant Elizabeth asked to take T.B. home.  The doctor informed her, at THIS time, that T.B. and Elizabeth could not leave, because Defendant Nieman had used her color of law to order the doctor to keep T.B. there until her return on the 21st of July, 2014.

9.  On July 21st, 2014, Emily Nieman, acting and operating using color of law in her allegedly official capacity as an Iowa employee/social worker for The "Governmental" business of the Iowa Department of Human Services, using power and authority not granted her by any agency or agent of the Government of the Republic; returned to Elixabeth at the hospital, after 72 hours, while she was exhausted from her stay, and first, tried to convince her to give her baby up to Safe Haven, a DHS supported facility.  She then did unlawfully remove Claimant Christopher's legal daughter T.B. from C.B. at a time he was not present, and without his consent or knowledge, and from Claimant Elizabeth, the Living Woman , T.B.'s rightful and lawful biological property; based solely on unproven and unlawful allegations and hearsay; at just 9 days of age. Six to seven felonies did occur during the course of this removal, including unlawful felony kid-napping, deprivation of E.B.'s rights using color of law, denial of the intervention of ICWA for nearly six months by and through Nieman's falsification of legal and Government documents, falsifying legal and government documents, forgery of Defendant Price's signature (as he ordered her to sign it for him) to a legal document, and finally, her later perjury, slander and libel of both claimants, as she testified under oath on the stand, and wrote in her reports; concerning not only the removal of T.B., but also in her legally required twenty one day assessment over 55 times; which caused the claimants to be temporarily and wrongfully placed on the abuse registry.

10.  A recording was made by Claimant Elizabeth, of the entire eighteen minutes of the unlawful "temporary removal", executed by Ms. Nieman who was acting in her official capacity, without power or authority granted her to do so.  Both E.B. and Ms. Nieman are clearly present.  On this recording, Ms. Nieman is heard asking the mother if she had any Indian Heritage in her family.  E.B. would say yes, and Ms. Nieman would then check "No" on the removal form.  She filed her affidavit to the Polk County "court" that the mother had no Indian heritage in her family on July 21st, 2014.  E.B. is 1/8th Cherokee, T.B. was the minimum required, just on her mother's side, at 1/16th.  The claimants had to motion the court for intervention, when they didn't even know that intervention was possible (at the time of the removal), or for five

additional months, at which time they realized the significance of her falsifying that answer actually accomplished – the bringing of the claimants' child under the false jurisdiction of Polk County and "The State of Iowa"; after they had found out that Ms. Nieman had done this. This court shouldn't have even been involved to begin with; and wouldn't have been either, if it had not been for this action of Ms. Nieman's.  This of course means that everything which would happen to claimants E.B., T.B., and C.B. in these false courts after this box was checked "No" is null and VOID, including the termination of the claimants' rights. The district court of 5C in Polk County, Iowa, to begin with, and at the very least, from that point forward, NEVER had ANY viable or lawful JURISDICTION of ANY kind to hear ANY matter concerning T.B. and E.B., until their heritage was properly determined; and even then, they had no jurisdiction over these claimants. They most CERTAINLY had no jurisdiction to hear any matter concerning claimant C.B. and said so too; but didn't enforce that ideal until the termination, and not until after six months of claimant Christopher being this court and the DHS in the case; after they felt that they had sufficiently made an example out of the claimants; and when C.B. was about to beat the case. C.B. would then be deemed an extraneous EXTRA father, an unnecessary party to the case, and thrown out (see claim items #47-52).  Ms. Nieman, by checking "No" on E.B.'s form when E.B. stated "yes" constitutes fraud, and blatant instances of both fraud upon the court and falsifying and forging a "Judges" signature to court and government documents; forging the claimant Elizabeth's initials on a "consent form" for temporary removal (signed in incomplete and without full disclosure as to its terms, had they been stated or read to her, anyway) signed by only one single parent when both were readily available; etc.  These acts, committed brazenly against these claimants also serve to effectively vitiate any and all subsequent orders issued by Defendant William A. Price ((who utilized color of law to act in his alleged official capacity as an Iowa State Judge in and for Polk County) concerning this matter in the next few months; including the month of January, when he finally realized he HAD to address the matter, or suffer greatly for it, should he continue to ignore it   All decisions, conclusions and orders subsequent to this event and made by this false court were, therefore, VOID. On this matter ALONE, E.B.'s rights should be lawfully and immediately restored; T.B. was in E.B.'s  possession at as well as from the beginning, and T.B. was removed from her illegally, and still is her biological property.

11. On the recording, Ms. Nieman uses color of law, and states that she is going to read the entire "order" to E.B., then have her initial the check boxes to show that Ms. Nieman had read it all to her and also served to show that E.B. understood everything on it, then says she needs E.B. to sign it.  She then, according to the recording (Exhibits 1A and 1B) and the form, the "Temporary Removal Consent Form," read her three lines of the "order", lines one, two and four, and did not read to her anything that concerned the unlawful reasons for removal, or anything that told E,B. her rights concerning this "removal," only those lines that explained that she was taking T.B., a petition would be filed, and that E.B.'s rights might be terminated. Ms. Nieman would then put check marks in all of the boxes for E.B. (effectively, forging the mother's initials in the boxes with a mark, showing the mother heard and understood what E.B. was about to sign when she most certainly did not), and placed her under duress, saying that if E.B. doesn't sign it, a "judge", claimed allegedly as Defendant Price will look unfavorably on that, then states it doesn't really matter if E.B. signs this form or not, the child will be removed to foster care, regardless; more obvious lies presented under color of law, and using legal duress. Per Iowa Statute, steps (defined as "reasonable efforts") must be taken PRIOR TP A REMOVAL, in an attempt to prevent or eliminate that removal of an Iowa child, and that the same steps MUST be listed, showing them to be executed properly, on the temporary removal

form. The box was checked, and three empty lines followed it. NO steps were taken, and none were listed. At the bottom of the form, defendant William A. Price's name was forged by Ms. Nieman, as the judge approving this temporary removal by Ms. Nieman.  Even if it had been Defendant Price's actual signature, it is signed fraudulently by his order on the form; since, if nothing else, in the order, it states that defendant Price found that reasonable efforts to prevent or eliminate the removal of T.B. had been taken; but again, none were listed; and, since they were required to be listed by statute, Defendant Price broke the law by signing it and agreeing that no steps were taking and stating that they were. More so, Mrs. Nieman, on this recording, uses legal duress and color of law to have E.B. sign her child into foster care, by stating that the removal is court ordered ALREADY, and that if E.B. doesn't sign it, it doesn't matter, the child will be removed to foster care, regardless.  Ms. Nieman was trying to coerce E.B. to sign the consent for removal, and it isn't "court ordered" until the court ORDERS IT, and it can't be court ordered, unless E.B. signs this form.

12.   The claimants, Christopher, the Living Man and Elizabeth, the Living Woman, state claim of damage, in fact, that Ms. Nieman, during and due to and as a result to only these actions, did unlawfully commit the felony charge of kid-napping T.B. from Elizabeth, and did so without plaintiff Christopher's express consent or knowledge, and in his lawful position as the child's legal father; and using color of law; Ms. Nieman then wore down and placed plaintiff Elizabeth under duress, first in an attempt to convince E.B. to give T.B. to Safe Haven; (A DHS affiliated facility), then even after E.B. declared her want to keep and take care of her child, still essentially E.B. to sign a consent form to remove T. B. from plaintiff Elizabeth without cause; without informing plaintiff Elizabeth of the reasons or the consequences of doing so;  deprived her of the knowledge of her rights in this removal; falsified the document by forging the mother's initials showing plaintiff Elizabeth had read and understood everything stated on the document, then falsified it by first stating that Elizabeth claimed no Indian heritage and filed affidavit of truth attesting to her falsification of the document concerning that matter specifically; thereby placing the claimants and T.B. in an unlawful and untrue jurisdiction, the false legal Jurisdiction of District 5C, Polk County Iowa.  Ms. Nieman deprived the claimants of their biological and legal property utilizing color of law and legal duress, thereby causing mental anguish to plaintiffs Elizabeth and Christopher for a period of not less than 4 years. Ms. Nieman also damaged the claimants' character, by engaging in libel and slander, in and through defamation of character; and by causing them to be on the Iowa Child Abuse Registry wrongfully for over 9 months. utilizing libel, slander and perjury on the stand and in her report on the parents, which was later ruled to be unsubstantiated by the ALJ and the director of DHS.  Also, damage did occur, in that Emily Nieman did falsify legal documents to acquire the biological property in question (T.B.), forged legal documents, colluded and conspired against the rights of the plaintiffs, and engaged in RICO activity, in that she conspired with others of The Department of Human Services (Hereafter referred to as "The DHS") and the courts and all of the attorneys involved up to this point, in order to defraud the United States Government for incentive monies for the State by stealing and adopting out children, terminating the claimant's and other American's God Given and unalienable right to parent, without cause. The claimants demand of this court to file criminal charges against Ms. Nieman, and grant the defendants relief for 4 years of mental anguish and pain and suffering due to the wrongful loss of T.B., their daughter.

13.   On July 22nd, 2014, at the claimant's first "Family Team Meeting" (called this while in attendance, but later was re-named to actually be a "Post Removal Hearing", in so much as it

could be additionally claimed to be a separate and ADDITIONAL "reasonable effort made to the claimants in order to help the family reunify"), attorneys were assigned both the claimants without their express consent.  Mr. Dale Mays, defendant, was appointed for E.B., (utilizing color of law granted him by defendant William A. Price, who had no power or authority to appoint him to do so for the unlawful court of Polk County, Iowa) and Colin McCormick for C.B. (utilizing color of law allegedly granted him by defendant William A. Price, who had no power or authority to appoint him to do so for the unlawful court of Polk County, Iowa) and Attorney Paul White was assigned to T.B (utilizing color of law allegedly granted him by William A. Price, who had no power or authority to appoint him to do so for the unlawful court of Polk County Iowa), as her Guardian Ad Litem (hereinafter GAL). Katie Gosch, acting and operating under color of law in her alleged official capacity as an employee of the State business "The Department of Human Services" using power and authority not granted her by any agency or agent of Government of the Republic, was assigned as the claimant's "DHS caseworker" for the duration of the proceedings, and Ashley Andrews (Cronbaugh) of Children and Families of Iowa (hereafter called "CFI") would be the visit supervisor. C.B., at this hearing, would ask Attorney Mays why it was necessary that claimants should have one attorney per parent. He stated that this was done in Iowa because it was possible that the claimants might have divergent interests concerning the child's welfare down the road. C.B. stated the claimants had no such divergent interests NOW, and they didn't need two attorneys. Mr. Mays stated that the claimants had no choice in the matter. The claimants state that this was done because the conspirators KNEW there would be "divergent interests" along the way; and if there weren't any, they would assure that there would be and that they would more than likely be the cause of it, by and through their actions against us. The claimants bring that the hiring of two attorneys, one per parent, should have been a decision made by the claimants, at a time that their interests actually did become "divergent," if at all. Because of the statement made by attorney Mays, the unlawful temporary removal of T.B., and later, the removal hearing, the claimants decided to fight against everything DHS and the courts would ask them to do from that point on.

14. The removal hearing took place on July 29th, 2014.and was presided over by William A. Price, who, while acting, using color of law in his alleged capacity as a Polk County Judge.  Defendant Price would claim and order that the removal of T.B. was valid, lawful and reasonable, in error. At this hearing, a week after the initial temporary removal was ordered, defendant Price would, and only after the claimants raised the issue during the hearing, state that the forced 72 hours stay of E.B. and T.B. at Methodist Hospital was the ONLY reasonable effort made E.B., in order to prevent or eliminate the removal of T.B. from E.B.  The claimants state this was no effort, it was a setup to document E.B., a new mother, one who had no experience with children as yet, as being falsely neglectful, by order of Ms. Nieman.  A report by one nurse at Methodist proves this setup well, as she came in to the room of T.B. and E.B. at 1 a.m., and woke the baby up to feed her because the mother was asleep on the couch and documented the action; then re-reported the incident again a half an hour later, putting E.B. in a bad light as neglectful because she didn't automatically wake up to feed T.B. at the proper interval of exactly 3 hours after the prior feeding.

15. Drug testing of both claimants was ordered by the court during the removal hearing on July 29th, 2014, (plaintiff E.B. had already taken this test once, and they would have her do another one, see claim #) and was to occur at Central Iowa Family Services, a facility operated by defendant Anthony Reed in Des Moines, Iowa. As we now already suspected that the court,

DHS, the county attorney's office AND our own lawyers were working in concert against us, and because the removal hearing had been a complete legal travesty, the claimants decided to experiment to see if this were true. The claimants noted immediately that not only was claimant C.B.'s online blog being used against them in court, word for word; they also noted that those of the court and DHS followed it almost religiously. Things the claimant C.B. wrote were, first, used as some of the reasons DHS and Stephanie Brown had used to take our child; and later, the court and DHS would continue to use it to keep the case afloat against the claimants. Claimant C.B. then decided to start testing that theory and decided to store up the results of that experiment to use against them in later actions. The claimants began doing this first with the first court-ordered drug test. In the blog, claimant C.B. wrote that he might come up dirty for two drugs, meth and pot, and posted this right after the claimants took their drug tests, and prior to the results. Once Defendant Price ordered our test, the claimants immediately complied and tested at Central Iowa Family Services, a DHS contracted drug testing facility. Both results came back as positive for meth and amphetamines, the worst of the two drugs claimant C.B. had mentioned in his post. The DHS quoted exact phrases C.B. had used in the article, those lines that stated that C.B. might be dirty for these drugs. Neither of the claimants do any drugs. The cord Stadt test of E.B. and T.B, done at Methodist Hospital two weeks prior to this testing had been negative for any drugs. Before taking the drug test at Central Iowa Family Services, the employee present did not ask E.B. if she was using any medications, like other drug testing facilities do.

16. C.B. then wrote an article concerning the 1st test and posted it on August 4th, 2014. Prior to the test, C.B. dyed and cut his hair, something he did and still does frequently. In the article, C.B. described the way the testing was done, and described in full detail the location that the testing was done in. It had dirty shag carpeting and had no furniture in it anywhere, save a large hotel type desk. There was one employee present, and he was sitting at a large desk in a big open room with no other furniture or walls in it. As C.B. entered and told the employee why he was there, the male employee stated "Man! I'm going to have to butcher your hair to get a good sample!" The employee then proceeded to procure that sample by cutting C.B.'s hair off with an un-sanitized pair of school scissors. At no time was the employee wearing gloves. The employee then sealed the hair into a small envelope to mail to a lab somewhere and said C.B. could go. Defendant Katie Gosch alleged, in the adjudication hearing in error, that C.B. had cut and dyed his hair on purpose, to foil this test. C.B. has not ever taken another hair follicle test, either before this (showing that he would have no knowledge of how to beat the test), of after this. Neither of the claimants have ever known anyone else that has ever taken a hair follicle test.

17. The CINA petition was filed on July 22nd, 2014, by Stephanie Brown, who was acting using color of law to perform in her alleged official capacity and acting as a County appointed attorney, working as an employee for the incorporated business doing business as the "Polk County Attorney's Office." Per Iowa Code, the petition was to be immediately served separately to each of the two claimants, and, as they are, documents had to be signed by both the claimants, agreeing that it was served and that they had received this petition. Filed on July 30th were two documents that the claimants had allegedly signed, agreeing that the claimants had received service of this petition. The claimants had not received copies, nor did the claimants ever remember seeing this petition or signing papers stating that they had been served this petition. The claimants testified this fact to the court at the adjudication hearing on September 12th, 2014. The claimants did not receive a copy of this petition until the

Adjudication hearing on September 12th, 2014, when Defendant Price, acting under color of law as a Polk County Judge with no jurisdiction over these claimants, then or now; ordered a copy be given to C.B., since C.B. had decided to represent himself, and asked to receive a copy. The claimants claim that these legal documents, showing that this petition was served to both, were either forged or scanned onto with their signatures.

18. Drug testing results, per Iowa Statute, are not allowed as evidence in an adjudication hearing. Stephanie Brown, acting under color of law in her alleged capacity as a Polk County attorney; filed these results as evidence prior to the adjudication hearing, held September 12th, 2014.

19. The claimants hereby state claim of damage in fact by Stephanie Brown, in that she conspired with both Ms. Nieman and Defendant Price to file a false unsubstantiated CINA petition against the claimants, and belittled and oppressed the claimants on the stand, to make them look like bad people and bad parents. She had also, evidently, conspired with Attorney Dale Mays to force him to be silent in representing E.B. during this questioning. Attorney Mays said nothing, and objected to nothing asked of the claimants, even when the questions that were asked by Ms. Brown were clearly harassing and abusive. The claimants state that Ms. Brown conspired against the rights of both claimants, and forged signatures on documents to show the claimants had received copies of the petition to remove T.B., when they had not, and showing that they signed in agreement, allegedly, that they had received said petition upon its receipt. Also, damage did occur, in that Stephanie Brown did falsify legal documents to acquire the biological property in question (T.B.), forged legal documents, colluded and conspired against the rights of the plaintiffs, and engaged in RICO activity, in that she conspired with others of DHS and the courts, all of the attorneys involved up to this point, in order to defraud the United States Government for incentive monies for the State by stealing and adopting out children, terminating the claimant's and others' God Given and unalienable right to parent, without cause. and slandered and libeled and defamed the characters of both claimants. Ms. Brown also supported the actions of Emily Nieman and, in so doing, is guilty of conspiracy to commit the federal crime of kidnapping.

20. Since the claimants lost their home because of DHS's actions (and their inaction, in not considering the FIP and food stamps the claimants had applied for 2 weeks prior to this. Ms. Nieman would later falsely state that help had been available for the claimants with T.B., and that we did not seek and/or refused help, at the detriment of T.B.'s welfare) against us, E.B. was forced to stay in a homeless shelter, and C.B. opted to stay with friends. The claimants had been without money for weeks; because E.B. had been forced to take a 6-week mandatory leave from work; due to the birth of T.B. She would finally return to work on or around September 1st, 2014.

21. On September 5th, 2014, another Family team meeting (our 2nd) was held. Immediately following this meeting, Dale Mays would insist that E.B. fill out another financial affidavit, showing that she was now working (at $7.90 an hour for 20-24 hours a week), and that she had no expenses (because she lived at a homeless shelter at that time.) All the afore-mentioned defendants, defendants Price, Gosch, Rhinehart, Andrews (Cronbaugh), Mays and Brown all knew this due to the claimants' report to them at this meeting. This affidavit followed a financial affidavit that was already in place from the month prior, showing E.B. had no income, which allowed her to be assigned Dale Mays at State expense. At no other time, during these juvenile cases, had another financial affidavit been filled out or was one ever

required of either claimant to fill out asked for. C.B. finally had E.B. fill another one out on January 8th, 2015 and filed it in the case. We had testified to the court our situation several times.  The claimants state, as fact, that defendant Price asked defendant Mays to have Plaintiff E.B. fill out another one on purpose, to later rule her able to pay for her attorney.  This would also serve to further block plaintiff C.B.'s access to the record; as he was already blocked from viewing or downloading files submitted by the prosecution, he would have further trouble getting documents after ruling E.B. as no longer indigent, so that, when she wanted documents from Mays, he would charge her a full attorney's rate for her to get them from him.

22.   The adjudication hearing was held on September 12th, 2014 at the Polk County Courthouse in Des Moines, IA.  Prior to the hearing, C.B. had placed over 1000 flyers advertising the hearing, all over the downtown Des Moines area. just prior to the hearing, the room the hearing was set to be held in was changed three times; and when people who had wished to attend it finally found it, and asked to be let in, the Polk County Sheriffs would ask Defendant Price to permit their admittance and he would deny it indiscriminately, and some of these people were of our family, who were allegedly permitted to attend according to Defendant Price.

23.   C.B.'s attorney, Colin McCormick, was asked to withdraw from plaintiff C.B.'s service on September 5th, 2014.  On September 12th, 2014, Defendant Price allowed Mr. McCormick to withdraw during the hearing for adjudication; and C.B. represented himself, pro se, for the remainder of the proceedings to follow. After this hearing, Stephanie Brown stepped down as the "Attorney" in charge of the claimants' proceedings, and Defendant Kevin Brownell, acting in his alleged capacity as a Polk County Attorney and using color of law; appeared in the case in her stead.

24.   In an order issued by defendant Price, acting using color of law and without jurisdiction, lawful or otherwise, in his alleged capacity as a Polk County Judge; would order a drug assessment and treatment for the claimants. The claimants refused these services, stating adamantly that they did no drugs.  Defendant Price would also order that claimants both have a mental evaluation and treatment. The claimants also refused these services.  C.B. did not have mental issues, and E.B. had already been recently evaluated, and results showed that E.B. only had a learning disability that only affected her ability to learn math skills.  E.B.'s evaluation was not acceptable for their files, defendants Gosch and Rhinehart would state, because the evaluation wasn't done by a DHS approved evaluator, but the same evaluation would be used to back up their claims as evidence that E.B. was unfit to parent (due to her alleged "diminished cognitive abilities", a false diagnosis not concluded in this test by the evaluator, only by defendant Gosch, who was not qualified to recognize any such disability in someone.  Claimants state that, were she qualified, she would have performed this evaluation E.B. herself, instead of insisting that E.B. go elsewhere), for the remainder of the case. The evaluation had been done just a month before, by Iowa State Vocational Rehabilitation, using a more than qualified STATE specialist in the field.

25.   After the adjudication, C.B. posted an article about what happened at the adjudication hearing on his online blog, scanned in all the relevant documents, and put it all up the same day. 2 days after this article was posted, C.B. was locked out and denied access to any document filed by the prosecution in the case, due to C.B. allegedly being "a security risk", according to the

Electronic filing system. The claimant believes this was due to the fact that defendant Price didn't like that Plaintiff Christopher was posting confidential pages of the court online.  This block was on this case until after the disposition hearing almost 2 months later.  C.B. then finally asked to speak to Randy Osborn, the head Polk County Clerk about this block.  Mr. Osborn acted as if he had no idea what had happened, and said he had no idea why C.B. wasn't allowed to look at the prosecution's filed documents.  Mr. Osborn then called Defendant Price to ask if C.B. could be allowed access, which he shouldn't have had to do, since C.B. obviously represented himself.  Defendant Price said yes, and the next day, Price would file an order that allowed C.B. access to the case, as if he didn't have this already.  This clearly indicated to the claimants that Mr. Price and Mr. Osborn had, purposely, denied C.B. access (as well as his due process) to the State's side of the record for almost 2 months.

26.   On September 12th, 2014 following the adjudication hearing, C.B. contacted Ashley Andrews (now Cronbaugh) of CFI by text and demanded that she remove herself as the visit supervisor and get the claimants a replacement.  They did this because Mrs. Andrews (Cronbaugh) had taken the stand in the adjudication hearing and testified and lied against them.  Not a single good thing was said about the claimants.  Ms. Andrews also told her supervisor, Jamie, about C.B.'s texts.  Ms. Andrews (Cronbaugh) then contacted Katie Gosch and her supervisor, Defendant Stephanie Rhinehart about the texts as well.  Just a couple of days later, the claimants had a visit with T.B.  Before it proceeded, all of these defendants wanted to have a word with C.B., to discuss the events following the hearing, and to discuss the text messages C.B. had sent to Ms. Andrews.  Defendants Rhinehart and Gosch then stated that Ms. Andrews would, despite the claimants' protests, continue as the visit supervisor, and told C.B. that he was to no longer contact Andrews (Cronbaugh) for any reason by text or phone, but that he was to text her supervisor, Jamie instead to verify his attendance at his visits. They also stipulated that he not speak to Ms. Andrews (Cronbaugh) at all in his visits.  C.B. agreed to the terms.  C.B. recorded this entire meeting and that day's visit.

27.   On September 24th, 2014, Stephanie Rhinehart, acting using color of law as an employee of the State company The DHS, in her alleged capacity as a DHS Supervisor; called C.B.'s phone and left him a message.  In it, she stated that she didn't care for what C.B. was writing about in his blog (about all that the Defendants aforementioned in the claim to this point were doing to them), and that, unless C.B. stopped writing, and would agree to meet with her supervisor at the DHS, that C.B. would no longer be allowed to visit his daughter. C.B. then returned her call, and in a voice mail left for her, told Defendant Rhinehart that there was no way that he would agree to her terms, and, essentially, told Defendant Rhinehart that she could go to Hell. Ms. Rhinehart did, utilizing color of law did attempt, utilizing deceit, to deprive claimant Christopher of both, his unalienable and Constitutional right to free speech, and his unalienable right to visit with his legal daughter, by use of unlawful, unreasonable and un-called for threats.

28.   On September 30th, 2014, C.B. then received a call from a detective Greg Morse of the Des Moines Police Department.  Morse told C.B. that Defendant Stephanie Rhinehart, together with Katie Gosch; Ashley Andrews (Cronbaugh) of CFI and her supervisor, Jamie, were collectively attempting to file harassment charges against C.B.  As Morse went over the facts and statements that had been made, C.B. stopped him as he mentioned a message C.B. left Rhinehart that day telling her to go to hell, and C.B. told Morse that message had been left in response to Rhinehart's call to C.B., and that C.B. had a voice message recording from

Rhinehart that stated, among other things, "Call me back", and that C.B. had recorded the entire meeting and visit from the day before, showing that these women and C.B. had all been OK with the text message problem by the time the visit started; which was in dispute of Defendant Rhinehart's side of the story. Morse stated "Well…I guess I need to have another talk with Mrs. Rhinehart, huh?" C.B. agreed and hung up. C.B. never heard anything more about it, and no charges were ever filed.

29.  In late September, C.B. gained employment, and kept the job for six months. C.B. cleared $1200 monthly, in addition to E.B.'s income; these two incomes together were more than enough, collectively, to support their child.  On October 1st, 2014, the claimants acquired an apartment, complete with expenses (electricity, heat, etc.  Neither claimant was ever asked to fill out another financial affidavit at any time.   Defendants Gosch and Rhinehart, who while acting under color of law in their alleged capacities as Iowa State employees for the DHS were supposed to visit and inspect all new residents of clients, not only for the possibility of visits with their children, but to ensure that clients are doing what they're supposed to be doing; in this case, refused to acknowledge that the claimants had gotten an apartment and testified and reported several times in the reports and hearings that followed that the claimants claimed that they had an apartment, and that neither of the defendants, Gosch or Rhinehart, had never been to the apartment to verify that fact; nor did they ever try, for to do so, they would have to tell the truth and report to Defendant Price that the parents were doing the right thing.  At no time did Ms. Gosch ever inquire of the claimants about their apartment, nor did Gosch ever ask to come over to verify that the claimants had one.  On October 16th, C.B. filed a change of address with the court.  All court documents from this time forward until the claimants' termination of parental rights hearing came to this new apartment's address; including their entire case file, sent to the claimants by Dale Mays. The only thing that did not ever arrive was the file on the claimants at DHS (our 'records') from Ms. Gosch, which claimants requested from Ms. Gosch three times - by message, by phone and in writing, all before the termination of their rights hearing. By statute, should claimants demand these records, they are to be given to them.  The claimants testified to Defendant William A. Price that the claimants had acquired an apartment in October during the December 11th, 2014 hearing to hear motions that C.B. had filed and C.B. reminded Price that the claimants had filed a change of address with the court.  Defendant Price stated, "Well, I don't pay attention to things like that." In the order for the claimants' Dispositional hearing, filed October 21st, 2014, Price listed "continued homelessness" as one of the primary reasons T.B. "shall remain in out-of-home placement., though by that time the claimants had informed ALL of the defendants afore-named about their newly acquired apartment.  The other reasons listed on this order, of course, were the fact that the claimants "refused to engage in (Price's unnecessarily ordered) services", i.e., drug abuse assessment AND treatment (like Price already knew what the claimants' assessment result would be) and mental evaluation AND treatment (like Price already knew what their evaluation would state them to be in need of;) and parenting classes (C.B. had, by this time, raised three boys into their 20's, and was teaching the E.B. everything she needed to know.) Those same reasons would be used in every hearing following the adjudication hearing.  Also, according to statute, Price is to ask the claimants, in every hearing, if the "services" the court was "offering" the claimants were sufficient.  In the adjudication hearing, claimants stated that they were.  Shortly following this, Defendant Gosch systematically withdrew the only services that were at all useful to the plaintiffs – The bus passes, and the visits with their daughter.  At no hearing that followed was this question asked again of the claimants, nor were they usually there to answer it but it

would appear in the pre-fabricated order of Judge Price at every subsequent hearing, and it said exactly the same thing; that we had said they were.  They were not.  Had the claimants ACTUALLY been at these hearings the entire time (most of the time, the claimants' walked out in utter disgust and anger), they would have answered the same as they did in their affidavit, filed by the claimants in both cases, entitled "Affidavit of NO reasonable efforts made", on February 12th, 2015.

30.   Twice, during these proceedings, once in December, prior to the first motions hearing held on December 11th, 2014, and again one day before the permanency hearing, on January 14th, 2015; a motion/notice was filed to the court NUNC PRO TUNC; rescinding all signatures on all documents that E.B. had signed, for the courts, for DHS and for E.B.'s attorney; whether under duress, or without knowing what she was signing.  Defendant Price, both times, would shirk this motion/notice; and throw it to the side with the intent of forgetting that it had ever been filed.  It did not show up in plaintiff C.B.'s download of all of the claimant's documents from these cases from December, 2014.  C.B. believes it was removed from the record purposefully and permanently by Defendant Price.

31.   On October 21st, 2014 at the Dispositional hearing; after we had gotten an apartment and E.B. and C.B.'s finances had long since changed; Defendant Price, using the financial affidavit Defendant Attorney Mays had E.B. fill out on September 5th, 2014 (showing E.B. to be homeless and having no expenses), would then order E.B. to now be financially fit to pay for her court appointed attorney, Defendant Mays and ordered her to pay them  Later, after telling Dale Mays that the claimants didn't want Mays at our hearings or to represent E.B. anymore; and, since plaintiff C.B.'s access to the record was still blocked from seeing all prosecutorial documents; the claimants then requested a copy of everything Mays had on the case. Mays informed the claimants, in an email responding to this request, that this would be quite expensive, and that he would have to bill the claimants to do that.  The claimants told Mays to forget about sending their file to them, and that they would find another way to get these documents.  Mays sent them anyway, with his bill for his services included in the package.

32.   Katie Gosch and CFI's visit supervisor, Ashley Andrews (now Cronbaugh), between September 12th, 2014 and January 15th, 2015, would downplay every effort made by both claimants to have their daughter returned to their care, and both continuously spoke badly of the claimants - on the stand in court and in their reports. Mrs. Andrews (now Cronbuagh) and her supervisor continuously reported the claimants as not able to be good parents, falsified all reports to the courts, claiming all the while that neither of them EVER learned to properly change a diaper, or properly put T.B. in a car seat, two ridiculous and unlawful reasons to keep the claimants daughter from their care, that Cronbaugh, Gosch, Rhinehart and Price would use unerringly, in every hearing.

33.   On December 11th, 2014 at 11:30 a.m., claimants attended a first hearing that was set to hear approximately 10 motions C.B. and E.B. had filed. One motion C.B. had filed concerned a motion attorney Mays had filed a couple days prior to this hearing, that asked the court to withdraw as E.B.'s attorney - a 2nd time, and at the plaintiff E.B.'s request.  The only reason the request to have him withdraw didn't work the first time was due to defendant Price refusing to provide any other attorney but Mays for E.B.; and since plaintiff Christopher wasn't comfortable yet in his new position pro se, the claimants decided they no other choice but to

allow Mays to continue to represent plaintiff E.B.  On this 2nd occasion, Mays had listed reasons in his motion that were completely untrue (one stated that he had E.B. fill out her 2nd financial affidavit on September 5th, 2014; in order to have the court determine that E.B. was unable to pay for her attorney and to have it paid for by the state; something that was already in force due to the first affidavit, filed 2 months prior to this one.  Defendant Price had ordered her to pay for her attorney a month and a half earlier, so of course, what Mr. Mays had stated as this reason in his motion, that he had wanted the state to pay for E.B.'s representation, did not occur, therefore was obviously a lie, nor was it a believable reason, since the State had already been paying Mr. Mays to represent E.B.; as well as another reason, stating that because the claimants had obviously "misunderstood his good intentions," in having E.B. fill out another financial affidavit, they had then gotten angry with him and asked him to withdraw) making himself look like an angel, and the claimants like mental patients. C.B. had, after this motion was filed, prior to the hearing; filed a motion to ask the court to direct Mays to correct his motion for the record of the court; and have him list the actual reasons for his withdrawal request.  Defendant Price, in order to protect attorney Mays, as well as cover his own involvement in what Dale had done against E.B.'s best interests; first, dismissed Attorney Mays from the case, then, threw out CB's motion to correct the facts of Mays's motion and the record; claiming it was now moot, because Mr. Mays was no longer associated with the case. Later, in the middle of a statement made by C.B. that began describing the incident that had involved Defendants Gosch, Andrews and Rhinehart's attempt to file false harassment charges against C.B. (see claim item #19) and attempting to have C.B. arrested; Price interrupted C.B. mid-sentence and loudly yelled "Lunch!" at exactly 12:00 (only 30 minutes after the hearing had started), then continued the hearing for a week later.  Claimant C.B. claims Price did this to keep the incident, as described in detail by claimant C.B., off of the court's record.

34.    As it seemed obvious that the claimants would never receive justice under Defendant Price, or get their daughter returned to them; C.B. called defendant Kevin Brownell, who at the time was acting under color of law in his alleged capacity as an Assistant County Attorney for the County of Polk, Iowa, on December 17th, 2014; presenting to him that C.B. had decided to stop fighting, and that C.B. now wished to go with the services that were ordered of them. C.B. did this as a favor to E.B., hoping to, possibly, turn around what seemed to be inevitable, the loss of their daughter.

35.    On December 18th, 2014, following a 2nd continued hearing to hear motions that C.B. and E.B. had filed; defendants Stephanie Rhinehart and Katie Gosch asked to speak to C.B. before he left, concerning his "change of heart"; concerning his statement to defendant Brownell.  They then proceeded to re-iterate their terms of the claimants' future interactions with their daughter, re-stated their allegations of neglect against both the claimants (included here were, again, accusations of the claimants' "drug addiction", a non-existent and, at the time, still unproven allegation; and that both claimants would need to agree to drug treatment for their "problems"); then repeated the services defendants Gosch and Rhinehart wanted the claimants to engage in.  Ms. Rhinehart then introduced C.B. to a man he had seen her and Ms. Gosch sitting with, during the hearing.  C.B. was told this man's name was Tony Reed, and that he had come to do a field urine test on C.B. for drugs. C.B. would later discover that Mr. Reed was not just anyone, Mr. Reed was the current manager for all of the testing centers in Iowa, including Central Iowa Family Services in Des Moines, Iowa.  Reed had come, he stated, because C.B. had served a subpoena on his testing center for someone (no one in particular) to come and appear on the claimants' behalf.  C.B. told Reed that he had also asked that

someone to bring along specific documents, and that he saw that Mr. Reed had not brought any along; but then C.B. stated that it was o.k., since C.B. didn't need anyone to testify after all.  Mrs. Rhinehart would then tell C.B. that E.B. was to do a field urine drug test just as soon as she got off work, at Central Iowa Family Services.  Neither of these tests had been ordered by Defendant Price, nor were they requested of C.B., or mentioned that a test would happen after the hearing by either Mrs. Rhinehart, Ms. Gosch, Mr. Price or Mr. Brownell until the hearing was over, and everyone was outside of the courtroom and on their way home. To be compliant, C.B. immediately agreed to do the test.

36.   Since C.B. had just used the restroom prior to the hearing, and wasn't ready to submit a sample yet, he informed Mr. Reed of this. Reed stated that he would wait, and that C.B. should drink some water. While they waited, C.B. engaged in explorative conversation with Mr. Reed, relating to him the events of C.B.'s first hair follicle testing at Central Iowa Family Services, and described the place to Reed; not knowing yet who Reed was, or his position.  C.B. described how that first test had gone, and how the place had looked.  Mr. Reed then became visibly ruffled and stated that he worked closely with those of that facility all the time; and made it clear that it had NEVER been like C.B. described.  Knowing then that C.B. could not trust Reed any more than where he had done his first test, C.B. decided to play Mr. Reed a little, to see just how far Defendants Reed, Gosch and Rhinehart would take things, to keep C.B. down.  C.B. then lied to Mr. Reed, and pre-warned Reed that it would be very likely that C.B. would test positive for drugs in his test.  Mr. Reed stated that he would see about that, soon enough.  Five minutes later, while C.B. paced, C.B. feigned a slight move towards one of the locked and inaccessible and non-exit courthouse doors, and Mr. Reed quickly moved to block C.B.'s non-available exit, then stated that there was no chance that C.B. would be getting out of doing the test - as if Reed had the power to force C.B. to do it.  C.B. then laughed and told Reed that he had no intention of not doing the test and told Reed he was ready to do it.

37.   C.B. submitted a sample and watched what Mr. Reed did following that. After watching for a moment, C.B. asked Mr. Reed if he would tell C.B. exactly what happened in the test, how the cup worked, and it determined C.B. was positive or negative, and for what drugs.  Mr. Reed then blithely described how the test worked, in full detail, and told C.B. how he would determine a positive and for which drug, had he been the tester. C.B. then asked Reed what his results were; and Mr. Reed began turning the cup away from C.B.'s view, took out his phone and started taking pictures of the cup.  Reed then stated, "I'll be sending Ms. Gosch pictures of your results, and it will up to her to tell you what your results are."  Mr. Reed then had C.B. pour his leftover sample into a smaller container and told him to seal it, telling C.B. that the lab would test this portion of it.  Reed then had C.B. throw the original cup in the trash.  Neither Mr. Reed nor C.B., at any time, wore gloves.  Mr. Reed then stated that C.B. was finished, and that C.B. was free to go. After Mr. Reed left, C.B. went back into the restroom to attempt to retrieve the testing cup.  The trash can in the restroom was locked, and since C.B.'s arm was not long enough to reach into the bottom of it; he dropped his keys into the garbage and told a Polk County sheriff that he had accidently lost his keys while reaching for a paper towel and asked if the sheriff would let him into it. The Sheriff then agreed to do it for C.B..  C.B. retrieved his keys and also the used cup that he himself had thrown into it. As C.B. got into his car, he looked at it. None of the things that Mr. Reed had described as occurring in the test results had happened. The cup was inactive.  No result showed on it at all.  To verify C.B.'s theory of what he thought was about to happen, C.B. called Katie Gosch, and left her a voice message; stating that C.B. had come up negative for drugs and passed the test. C.B. then went

17

to pick up his wife from work and took her to Central Iowa Family Services, where the claimants had tested previously in their hair tests. On the way, C.B. told E.B. not to do a test unless she could have a witness to it. After E.B. went in, Katie Gosch called C.B. back, and began to tell him how his drug test had come back positive for meth again. C.B. hung up on her mid-sentence and waited for his wife to return.

38.   When E.B. returned, she informed C.B. that she was not allowed a witness to her testing and didn't do the test. C.B. then told her to get her things, that they were leaving. When E.B. returned, she had, in her hand, her unused field testing cup that she had picked up with her things, accidently.

39.   Upon returning home, C.B. did another test in E.B.'s unused cup. It came out with the same result as the one C.B. had thrown away at the courthouse...inactive, with no results, positive or negative. The claimants then realized that this had been a trick to make the claimants look dirty for drugs a 2nd time, guilty of abuse, and in need of the court's services, as well as gravely in need of the drug assessment and treatment services they had been ordered to engage in unnecessarily.  C.B. immediately took pictures of the two cups, one of the cup that he had just done the test in (with the sample still in it); and the one from Mr. Reed's test. C.B. then wrote an article about these events and posted it on his blog, along with the pictures he had taken of both cups; knowing Ms. Gosch would eventually read the article.

40.   On January 8th, 2015, Plaintiff Christopher took these 2 cups in to the court and filed them as evidence in the case on the same day, and also submitted enough evidence that presented and destroyed the entire case of the state against them, including the recording of Ms. Nieman's removal of the claimants' daughter.  This recording had been misplaced on the plaintiff's cell phone and could not be found until around December 2014.  None of the evidence the plaintiff had brought in and filed was ever admitted as evidence in the case and stayed that way for 6-8 days.  In effect, this action served to deprive both the claimants of their due process, since, at the beginning of the subsequent hearing on January 15, 2015, Defendant Price would address first and only, the motion to dismiss plaintiff Christopher as a necessary party.  When plaintiff Christopher went to the clerk's office to retrieve his evidence, they told him it had been disposed of, because it was his, and he was no longer a party.  Plaintiff Christopher claims defendant Price destroyed the evidence immediately upon its receipt, because of his conspiracy with Defendants Brownell, White, Gosch and Rhinehart to dismiss him before it could be inquired or addressed.

41.   On January 2nd, 2015, an order was (allegedly) filed in the case by Defendant Price, granting Defendant Attorney Mays (again?) permission to withdraw from the case, and stated the effective date for that permission to be December 15, 2014, half a month earlier.  This effective date was four days following the initial one of two motions hearings that had been held on December 11th, 2014, in which Defendant Price had, at that hearing's onset, granted Attorney Mays permission to withdraw from the case; supposedly effective THAT day at THAT time.  Price would then dismiss attorney Mays from the courtroom, and, following this, subsequently threw out a motion C.B. had filed to correct Mr. Mays' motion, claiming his motion to be moot, because attorney Mays was no longer associated with the case. Then, C.B. remembered that Mr. Mays had been served a subpoena to testify at the second continued motions hearing on December 18th, 2014; and it was served by C.B. on Mr. Mays on December 15th, 2014.  Immediately following this service, Mr. Mays then electronically filed a motion to

quash the subpoena in the case, although he supposedly was not associated with the case. On January 15th, when C.B. was removed as a necessary party to this case, he was un-indexed from the electronic filing system within a half an hour.  Defendant Price ordered this almost immediately.  C.B. most certainly was not able to do what Mr. Mays had done, four days after his supposed removal from this case (see claim item #33)

42.  C.B. did not bring the matter of Mr. Mays being able to file in the case after being dismissed from it until January 22nd, for the very first time, in C.B.'s filed answer to the permanency order. C.B., after noticing the order defendant Price had filed on January 2nd, 2015 in his downloaded case files in January 2017, he had thought it strange that he'd never seen this order or received notice that it had been filed.  This order, filed on the 2nd of January 2015, looks as though it was submitted as a definite after-thought, and very obviously filed in order for Price to cover his mistake in covering for Attorney Mays, then allowing him to continue to be electronically able to view and file documents in the case; though Mays was no longer allegedly associated with it, per order by Price. Also, though it was submitted by Price on January 2nd, 2015, more than 2 weeks after this matter occurred, (which is, by itself, strange enough), the matter wasn't noticed by C.B., nor was it brought up, or addressed by C.B. until January TWENTY second, in C.B.'s answer to Defendant Price's order - over a month later than the December 11th hearing, and over a week later than the order for permanency.

43.  On January 9th, a report was filed by Ms. Gosch; her final report to the court before the determination of permanency.  As C.B. had expected it would, it contained an alternate version of the story C.B. had told on his blog, related in the third person as the testimony of the events per Anthony Reed, and details that C.B. had described in his post were meticulously covered by Mrs. Gosch in exact denial of everything C.B. had written, showing that Ms. Gosch had obviously read C.B.'s side of the story and was attempting to discredit him and all he had related.  Ms. Gosch would refer to Mr. Reed telling these events to her:  first, according to Mr. Reed, he himself was the only one who ever handled the testing cups, and it was Reed, during the test, who, after getting no results, determined that the cup he used in C.B.'s FIRST test sample was inactive, and therefore, defective; and that it was he that threw that cup away in the garbage.   Reed then stated that he got another cup out and acquired a SECOND test sample from C.B. (remember - C.B. was, at that time, barely able to provide enough for a first sample), and that Reed had also been the one to throw the second cup away as well, after the results of that test. Mr. Reed then stated that when C.B. retrieved his acquired cup from the trash later, that C.B." must have grabbed the defective one that he (Reed) had thrown away." after acquiring the first sample, the first "defective cup."  This relation of Mr. Reed's "facts", of course, was an outright and total fabrication of the events.

44.  After addressing that lie in her report, Ms. Gosch went on to describe the calls C.B. had made to both her and Ms. Nieman on January 5th, 2015, on the weekend, when the plaintiff C.B. KNEW they were not going to be there or answer their phones; to gloat about the things that he had filed in the case hearing for permanency (held on January 15th, 2015).  Ms. Gosch at this point then boldly lied to the court and stated that, in Ms. Nieman's messages, C.B. had threatened to kill her.  NOTE: The transcripts for these voice mails were filed by DHS in BOTH of our juvenile cases, on January 7th, just two days after they were made. There was no message to either that described, related, or repeated any of the words that Ms. Gosch would claim were stated to Ms. Nieman, nor was that threat even insinuated.  Also, the transcript shows that the message to Ms. Gosch "became garbled" and that it "continued inaudibly"

after this.  This was stated because C.B., at that very moment, had asked Ms. Gosch in the same message for all his records from DHS.  This portion of the message was purposefully omitted; to deprive C.B. of his records and claimed to be "inaudible").  Also submitted towards this hearing were C.B.'s lab results, from the drug testing sample he poured and sealed without gloves; and that Mr. Reed had, allegedly, sent to them. An abuser of meth, someone that uses it daily, comes in at a test result of approximately 2-3000 ng. C.B.'s results on Mr. Reed's lab form showed a rather staggering result of 21,000+ ng. C.B. investigated this result, to find that a person would have had to have shot up an ounce of meth just minutes before the test to come in with this result; and would have, more than likely, been dead by the time they finished giving their sample. NOTE: C.B. believes it quite important to mention that Mr. Reed's facilities in Iowa put around 1800 parents through their unsanitary and generally unprofessional drug testing centers collectively, every month.  Iowa's children are dependent on these test results, and parents are depending on DHS to return their children. One test, done on C.B., was falsified.  Even with the original evidence destroyed, C.B. has clear and convincing evidence of this.  The very first drug test done on E.B. had to be re-done, because they collected too much fake hair with her real hair. Her fake hair was the opposite color of her real hair, cost around $.97 a metric ton, and looked like straw. It was also blonde.  If a place takes hair samples for drug testing, they should at least know the difference in real and fake hair, especially if one is bright yellow, and the other is black.  If Anthony Reed's facilities falsified or screwed up even one test or its results, it's possible they screwed up or falsified 100; or maybe 1000, maybe more.  Iowa's children are depending on these centers to do the right thing, so that they can go home to their parents. These centers need to be shut down, and Mr. Reed needs to go back to his first and foremost job in Iowa, as a JCO. DHS, by the way, was at THAT time his ONLY contract. It should be obvious why.

45.  The determined "biological father", R.S., (represented by defendant Attorney Katherine Beth Walker) had sex with E.B. only once, in January of 2014, while the claimants were briefly separated; and, after that, R.S. wanted no more communication, and nothing more to do with E.B. After the claimants reunited a month later, and after C.B. discovered that she was pregnant, she informed him that she didn't know exactly who the father was, since she had relations with two men during this time, and one had died. When it was determined that J.B. (the possibility that was dead), who the mother thought WAS the biological father of our daughter, was determined to not be the father, DHS then pressed E.B., and eventually pried the name of the other possible father, R.S., out of her.  As soon as they got his name and where he was possibly living, the department then hunted down the biological father, R.S. of Newton, Iowa during our juvenile cases, and had him also do a paternity test. The results would show that R.S. was indeed the biological father of T.B.

46.  After a paternity test proved that R.S. was the actual biological father of T.B., the petition to terminate, not just the claimants' rights, but the rights of the biological father, R.S., as well, was filed in the newly formed termination case on January 9th, 2015.

47.  Plaintiff Christopher would, prior to its date, predict and relate to his wife the precise order that events would occur in the oncoming permanency hearing, held on the date of January 15th, 2015. This was all made possible by and through a rampant round of motions that were hastily gathered and submitted into the case by Mr. Brownell.  This was a rather illogical and non-sensible group of motions; that were, in no real way, based in any real fact or law, and used prior judgment and case law that was obviously decided and ruled on in error by those

ruling on the board of judges and pretending and acting, utilizing the color of law; and so named and incorporated as "The Iowa State Supreme Court," utilizing reason that obviously spits in the faces of our Federal SCOTUS, who has ruled over and over again in full support of the unalienable right of parents to raise their own children as they see fit, unless undeniable external circumstances or obvious danger is involved; and should unerringly require a court's lawful intervention for whatever reason.  No judge can magically raise his gavel to deprive any parent of their God-given, constitutionally guaranteed and inherent RIGHT to be parents to their children, unless actual circumstances of abuse occurred.  If actual or proven abuse, whether that abuse or neglect be mental or physical, did in fact occur, then formal charges should have been filed by the involved and afore-mentioned defendants, named herein.  None were EVER filed.

48.  C.B. stated to his wife the night before, and to R.S. the next morning at the permanency hearing before defendant Price would even enter the room; that Price would, first, before anything else could be raised or addresses, start the hearing immediately without fail with the prosecution's motion to establish paternity; the motion he had filed that allegedly claimed that R.S. was the rightful and lawful father of the claimants' daughter, T.B., and that would subsequently eliminate plaintiff Christopher as a "party of interest" in the CINA proceedings, which concerned his legal daughter, T.B.  The true purpose behind this motion was not in order to establish rightful standing to T.B. through paternity of the same, or in order to identify R.S. as T.B.'s actual father.  The claimants know and can prove beyond a shadow of anything that even looks like justice, that this motion was submitted after a collusion of defendants Price and Brownell, in order to rid these criminal defendants, the court, and the DHS of the biggest threat to their organized and obvious 'Legal Kidnapping' organization, plaintiff Christopher.  Using this motion, they would label the LEGAL and continually present father as an extra and unneeded father; though Christopher HAD been present for claimant E.B. and T.B., not only through E.B.'s entire pregnancy, but through all the proceedings that arose from the afore-mentioned and named defendants' conspiracy and legal abduction of E.B.'s daughter, T.B.; and who had been in the fight for E.B.'s rightful biological property for the ENTIRETY of the CINA case until permanency, in place of where R.S., the apparent 'Sperm Donor", should have been.  Why would plaintiff Bruce be involved at all in any of these unlawful cases, if he was never in possession of a single parental right, according to none other than the very court who had him removed from the case because of his apparent lack of these same rights?  They certainly didn't have any issues or qualms in placing C.B. in an accusatory and defending position in both of these cases as they were allegedly irrelevant to this claimant, since a.  he was not the biological father, therefore, had no right of interest in T.B., a massive and outright lie.  As a legally married husband to. E.B., Christopher then had every right to be legally counted as a party of interest in this child.   Any child born to E.B while married to plaintiff Christopher, endowed him with undeniable and obvious legal standing in any matter involving T.B.  Whether he was biologically tied to the child or not; he fought faithfully by E.B.'s side and FOR E.B. and T.B., even following his being thrown out of the CINA CASE.  Because they had actually identified the actual bio father, they would state that Christopher had absolutely no legal rights to show interest in T.B., had no rights as a parent to this child of his wife's, and thereby, he would subsequently and conveniently be deprived of his rightful standing to claim against these criminal defendants in future actions.  Defendant Price would claim that Plaintiff Christopher, because he wasn't the biological father of T.B., had no rights concerning T.B. at all, and tossed him out of the case and his courtroom on the day of the permanency hearing, claimed plaintiff E.B. as both 'Abandoning the hearing, and all

of their motions and evidence" and within a half an hour, would then order (and, of course, accomplish these things immediately) all of plaintiff's motions and evidence be removed from the case or destroyed; and would then also order the un-indexing  plaintiff Christopher from this case on E-file.

49.   Defendant Price then made his biggest and most criminal error to date at this time.  The motion to establish paternity and rid the court of plaintiff Christopher as the legal and rightful father of T.B. and establish R.S. as that party instead, was ALSO filed in the parallel termination case, and, just as it was in the CINA proceedings, was filed twice to ensure it was addressed without fail.  And yet, even though the claimant Christopher "had absolutely no right as a party of interest to his daughter, T.B." allegedly, according to defendant Price's unlawful and incorrect order concerning T.B.'s permanent placement, Price then did none of this in the termination case.  It would not be addressed there at all.  Claimant Christopher alleges this was done for one and not the other, because it was the blatant criminal intent of defendant Price against plaintiff Christopher, due to defendant Price's sincere hatred and bias against plaintiff Christopher; and was implemented in this manner maliciously as some form of Price's view of justice for himself for suffering even a little at this claimant's hands; in order to terminate his ACTUAL rights.  It was a clearly vindictive and overly cruel punishment, because the plaintiff Christopher had dared fight the criminal system of Iowa; and had caused trouble to defendant Price himself on several occasions.  He meant to utterly terminate and unlawfully deprive and decimate the same plaintiff's actual rights, rights he allegedly was not in possession of in the other associated case.  To allow C.B. to remain in the CINA case would ruin the State's entire case against the claimants.  This particular scenario, if none other, should, more than anything else, show the length, the depth, and the immensity of the conspiracy against both E.B. and Plaintiff Christopher, who was in the process of winning the claimants' case.

50.   Plaintiff Christopher, at this time, did not yet realize the more damaging conspiracy that had already secretly developed between defendant Price and Defendant Walker, R.S.'s alleged attorney at the time.  These defendants had, of course, agreed to work together, which accomplished two things:  first, that they now would have someone else to award E.B.'s child to, that WASN'T these claimants, or their families - R.S. ( who had, until this, been absent throughout her entire pregnancy, and for 6 months after T.B. was born, because R.S. had had sex with E.B. once during a time of a very brief separation that had occurred for just 3 months, during which time, E.B. had met the biological father, and they had spent a few days in each other's company, but as soon as R.S. had gotten what he wanted, one night's relations with E.B., he cut off all communication with her, and had no desire to even speak to her again. He would have still been in that position, by his own choice, but the DHS hunted him down for the sole purpose of identifying the real father of T.B., so that they could terminate his rights as well as the claimants' rights.  The ORIGINAL petition to terminate the claimant's rights had ALSO and IMMEDIATELY included R.S., showing their original intent) and 2nd, so they could now raise that plaintiff Christopher, who of course was the only loose cannon that could possibly ruin all the defendants afore-mentioned thus far in this complaint had all worked very hard to accomplish; was no longer needed in the case.  Defendant Walker would also win, in that she could win this case for her client, R.S.

51.   On January 15th, 2015, at the Permanency Hearing's outset, Defendant Price was, as C.B. had predicted, overly anxious to hear defendant Brownell's motion; so anxious as a matter of fact,

they filed the motion to establish paternity twice in both the CINA case and in the termination case as well.  Before defendant Price even made it to the bench, he stated "OK, we have a lot of evidence and motions that have been filed by the (claimants) defendants to address, but first, where is that motion to establish paternity, Mr. Brownell?"  After looking for it for a few minutes, they found it, then addressed the motion FIRST, so as to first, be able to eject claimant Christopher from the courtroom before they would have to address the motions and the evidence he had filed; evidence so damaging that would have completely destroyed their whole case against both of the claimants;; and 2nd, because of plaintiff Christopher's dismissal as a party of interest in the case, they could now, with legitimate reason, systematically throw out and destroy this original evidence, and would then not have to address any of claimant's motions and filed evidence. After the claimants left the permanency hearing, defendant William A. Price, in a surprise move, would order that R.S, who hadn't even been officially involved in the case at all until that day, should, as T.B.'s real father, get the same chance that C.B. had to be compliant with what DHS and the courts would ask of him (which was nothing compared to what they asked of the claimants, was infinitely simpler for someone to accomplish, and would require very little effort on R.S.'s part) and then awarded R. S. full unsupervised visitation with his (the claimants') daughter. After the claimants had acquired an apartment, both E.B. and C.B. would ask DHS and motion the court SEVERAL times for, at the very least, supervised visitation in their apartment, as well as re-allow C.B. visits with T.B., without DHS's ridiculous stipulations.  Each and every motion and request were denied or ignored, depending on who was getting the request or motion.  As a matter of fact, after the date of September 12th, nearly EVERYTHING, especially various things filed by the claimants in these cases, was not addressed, was completely overlooked, not noticed, never answered, ignored, and outright thrown away or destroyed.

52.  In the order for permanency, issued January 15th, 2015, Defendant William A. Price stated that the claimants allegedly "abandoned the hearing, and all the motions that were filed in it;" when in fact, they left the courtroom because Price had thrown C.B. out as a necessary party before anything else could be addressed (and, naturally, all of the motions that C.B. had, allegedly "abandoned"); and after E.B. ordered Defendant Price to recuse our case, due to bias, and he refused. What isn't mentioned in his order is that Price ordered the Polk County Sheriff to retrieve E.B. after she left, and they drug her back to the courtroom, so that Price could address the only motion filed prior to the hearing that could be problem for him, had he not addressed it - the motion for intervention by the Cherokee Tribe. Since Ms. Nieman had effectively deprive E.B. of that possible intervention for nearly six months by falsifying her removal document, Price knew he'd have to address it promptly.

53.  On January 21st, 2015, Katherine Walker would appear in the case to represent R.S.

54.  Immediately following her appearance, C.B. contacted Defendant Katherine Beth Walker at her firm; not only to warn her about what had occurred involving the claimants up to that time and warn her not to trust DHS or Defendant Price, but also to inform her that a petition to terminate ALL the parents' rights, including her client R.S.'s rights, was already in force.  C.B. could not speak to Ms. Walker, so left that message with her paralegal.

55.  On January 25th, 2015, Ms. Walker filed a motion to continue the termination of parental rights hearing. On it, cited as one of the reasons for the continuance, was the fact that Ms. Walker could not possibly attend on that day.

56. On February 19th, 2015, suddenly, in the final hour, the petition to terminate parental rights was amended to disclose R.S. from his parental rights being terminated.  A flurry of reports were filed from seemingly nowhere in just a matter of a few days following this amended petition, from both DHS and CFI; all praising R.S. and his most apparent wont to be a father, and about his total compliance in going along with all that the DHS asked of him willingly (which, at this time, had been only visits, the paternity test, and a drug test - things the claimants had ALSO done, willingly), and portraying R.S. to be a saint, and very nearly God-like in his parenting style and skills; in order to get these reports placed on the record in time for the all-important termination hearing...which, by the way, it's important to note that Attorney Beth Walker was, after all, miraculously able to clear her calendar in order to attend on her client's behalf, at the very court, date and hearing she had motioned, just days before this, stating she needed a continuance of the termination hearing, because it was "impossible to attend on that date".

57. On February 20th, 2015, Ms. Rhinehart, Katie Gosch and Emily Nieman would again allege that C.B. harassed both Emily Nieman and Ms. Gosch, and, according to Defendant Jake Lancaster acting using color of law as an employee of the Des Moines Police Department, those defendants of DHS now intended to claim that C.B. had been harassing them all since July of 2014. After several harassing phone calls to C.B. from Mr. Lancaster, (because he refused to stop calling C.B. incessantly, at which time C.B. chose to turn his phone off), a warrant was then issued for C.B.'s arrest, almost a full month and a half later than the phone calls had been made to Ms. Gosch and Ms. Nieman. Unbeknownst to all that mattered, however, the claimants had decided by this time to move away (due to C.B.'s promotion in his job) to Carroll Iowa, without notice to anyone but his boss. When Mr. Lancaster couldn't find C.B. in Des Moines, or, where C.B. had said he was working, Mr. Lancaster then took to visiting and harassing C.B.'s relatives in Des Moines, by coming by their homes constantly to ask if they knew where he was.  Mr. Lancaster did not stop this behavior until the time C.B. was finally arrested, almost a full month later.

58. The warrant for C.B.'s arrest contained these charges, and was being prosecuted by Defendant Kevin Bell, who was acting and operating in his alleged capacity as an Assistant Polk County Attorney working for the county of Polk in Iowa; utilizing color of law: Harassment in the first degree (this charge concerned the "threat of Ms. Nieman's life" on her voice mail, something that never happened), an aggravated misdemeanor, and two other simple misdemeanors, also for harassment, but in the 3rd degree instead, one for each of the two workers. The "victims" were Emily Nieman (C.B. called her one time, during the period of July 2014 until that day, January 2nd, 2015), on the weekend, while C.B. knew her phone was off; to relate to Ms. Nieman that C.B. was about to win because of what he had filed for the Permanency hearing, and that Nieman was likely to lose her job; and Katie Gosch - who was, at that time, still the claimant's active DHS caseworker - the same day, on the weekend, when C.B. knew it was likely to leave a message, and said pretty much the same thing to her. Prior to that, C.B. never had the desire to even see Katie Gosch, let alone did he ever speak to her, if he could avoid it. The calls were made on January 5th, 2015. The charges were filed a month and a half later, exactly a week before the Termination hearing. Upon filing these charges, because Mr. Lancaster was most anxious to find C.B. and arrest him, Jake Lancaster of the DMPD would then place C.B. in the NUMBER #1 POSITION of the "Metro's Most Wanted" website and on Facebook. This segment also ran in both CityView magazine and was also aired on Channel 13's

news broadcast every week. C.B. was the #1 wanted criminal in the area there for well over a month, until and even a week AFTER he was arrested (they then just put up his mug shot and put the word ARRESTED over it). Because of the claimant's fear of C.B. being arrested at this critical time, with a very important assessment appeal coming up, and another obvious Supreme Court appeal (for the soon-to-be missed termination hearing) on the way, the claimants decided that is was obviously in their best interest to NOT attend the termination hearing; as was the plan and conspiracy of ALL of the defendants involved at this time.

59. On February 28th, 2015, the claimants' rights were unlawfully terminated in an order issued by defendant Price.  On the same date, T.B. would be awarded solely to R.S.; even though it was little more than a year after he had irresponsibly shunned and shut out E.B., not caring to even check up on her afterwards, just in case E.B. may have gotten pregnant with his child. Instead, and only after DHS hunted him down to tell him that he had a daughter, R.S. raised his finger at the last minute to claim her, after C.B. had fought for her return and was the court's target in R.S.'s stead as T.B.'s father for six straight months. T.B. was in foster care from July 2014 until February of 2015, when the mother's rights were terminated.  C.B. was removed from the CINA proceedings in January 2015 by Price, allegedly because of C.B.'s paternal status (the non-biological LEGAL father), and his "lack of any rights to be a party of interest in these cases"; and yet the same rights that C.B. supposedly didn't have in the matter of T.B., in the CINA case continued to be terminated by Defendant Price in February of 2015, a month and a half later.

60. Reunification was NEVER the intent, either of the DHS, or the courts that supported them and their illegal and unlawful actions entirely; no matter how ridiculous their lies got and no matter how wrong their retaliatory and vindictive behavior was in turning against the claimants. The claimants also claim that ALL, that had been involved thus far, and even R.S.'s attorney, conspired with Price, the DHS, and all at the county attorney's offices (including and ESPECIALLY assistant County Attorney Kevin J. Brownell) offices to make sure T.B. went somewhere, ANYWHERE…and to ANYONE, as long as no one gave her back to the long married and loving parents who wanted her to begin with and still do, and who had fought against this, to have her returned, quite literally against all odds, for 6 long, traumatic months.  The Claimants hereby claim, as damage in fact, against each of the remaining involved parties up until this time:

   a.   For defendant Kevin J. Brownell, claimants state that Mr. Brownell did conspire against the rights of the claimants at all times, by conspiring with DHS to keep T.B. away from the rightful parents, by conspiring with Dale Mays to keep T.B. away from the rightful parents, the claimants, by illegally removing C.B. from the case as an interested parent with rights to T.B., by conspiring with DHS's Stephanie Rhinehart and Katie Gosch to deprive the parents, the claimants their rightful biological property, by depriving plaintiff Elizabeth her right to challenge the court's jurisdiction to be false due to her ICWA rights, and by terminating the rights of plaintiff Elizabeth against her Constitutional and God-given right to parent using color of law.  The defendant, Brownell, is also, by association, a member of a RICO organization, which operates under the guise of leadership, in order to defraud the U.S. Government of funding by stealing and adopting out children and conspiring to order services of parents that are not needed.  Mr. Brownell, is also, by association, guilty of conspiring to kidnap Elizabeth's rightful biological property.  The claimants claim 4 years of mental anguish at the hands of Defendant Brownell.

b.  For Defendant Price, claimants state damage in fact, that Mr. Price did, acting as a lawful judge in a matter he had no business in or jurisdiction of, because of Elizabeth's right to tribal intervention, as well as acting using color of law against the unalienable rights and Constitutional rights to parent her child as she sees fit, without intervention, unless warranted by law, yet no charges were filed.  Mr. Price conspired with Kevin J. Brownell, Dale Mays, Anthony Reed, The DHS, the AG's office, the Supreme Court, Katie Gosch, Stephanie Rhinehart, and Katherine Walker to deprive E.B. of her right to parent, and assisted heavily in the illegal kidnapping of E.B's rightful biological property and terminated her rights without cause.  Mr. Price also assisted in falsifying documents of the court (i.e.; the entire termination transcripts), changed the record of the court, and wrongfully deprived plaintiff C.B. of his right to defend himself in his own person for 2 months, and deprived plaintiff C.B. of his right to due process by blocking his ability to see prosecution's documents for a period of 2 months.  Defendant Price also is guilty of kidnapping, collusion and conspiracy against the rights of both claimants, and caused them both mental anguish that has continued for nearly 4 years.  Defendant Price also imposed unconstitutionally high bail against plaintiff Christopher in misdemeanor case SMAC363417 (see claim item #111) in the excessive amount of $1500 cash only, for 3 simple misdemeanor charges, without good cause.  Mr. Price, 3 times, denied both claimants their right to determine his bias against the claimants, and refused to recuse himself due to the same bias, also 3 times, causing the loss of both the claimants rights to their rightful biological and legal property, and by causing plaintiff Christopher to spend time in jail without cause, by and through conspiring with Defendant Anastasia Hurn, and by himself overseeing the 'appeal' to case SMAC 359086 (see claim item #88-89.)  Defendant Price also damaged the characters of both claimants through the crimes of libel, slander and defamation of character.  The defendant, Price, is also, by proxy, a member of a RICO organization, which operates under the guise of leadership, to defraud the U.S. Government of funding by stealing and adopting out children and conspiring to order services of parents that are not needed.  sought to deprive Christopher of his unalienable and Constitutionally provided rights to life, liberty and happiness, due process, and right to a fair trial by a jury of his peers.

c.  As to Katie Gosch, the claimants claim these damages in fact - defendant, acting under color of law to deprive the claimants of their rights to parent as they see fit as a social worker with no authority to do so, defendant Gosch assisted and conspired to kidnap claimants rightful biological and legal property, T.B.; and unlawfully terminate their unalienable and Constitutionally provided right to parent, without cause; by conspiring with the Court, Kevin J. Brownell, Stephanie Brown, Stephanie Rhinehart, Ashley Andrews, Dale Mays, and Anthony Reed.  Defendant Gosch did also file false charges against plaintiff Christopher in order to affect the claimants' attendance at their termination hearing by conspiring with Defendant Lancaster, Defendant Nieman, Stephanie Rhinehart, Kevin J. Brownell, Paul White, Defendant Price and Defendant Bell to make it happen; defendant Gosch did, for a period of around 10 months, cause irreparable harm, not only to the claimants characters and reputations, in and through libel and slander, she caused the claimants great mental distress, and that distress continues to this day.  Katie Gosch, acting in conspiracy with all the defendants, is obviously engaged in RICO activities that are meant for no other purpose but to illicit funding falsely from the U.S. Government by and through the acts of stealing children from parents without merit, and pawning them off to select foster families for the later purposes of adopting them.

26

d.  Concerning defendant White, the claimants state that he did conspire to damage the claimants with all the afore-mentioned and relevant attorneys named thus far, defendant Price, Katie Gosch, Stephanie Rhinehart, and more in these matters; to affect the claimants the loss of their rightful and lawful biological property, and to cause them untold mental distress.  Defendant White did also conspire with the afore-mentioned to produce a fabricated transcript for the termination hearing of the claimants. Defendant White, thereby, is obviously engaged in RICO activities that are meant for no other purpose but to illicit funding falsely from the U.S. Government by and through the acts of stealing children from parents without merit and pawning them off to select foster families for the later purposes of adopting them.  The plaintiffs claim damage of four years of emotional distress, libel, slander, defamation and mental anguish.

e.  Concerning Defendant Mays, Mr. Mays did conspire to damage the claimants with Defendants Price, White, Rhinehart, Andrews, Brown, Gosch and Brownell; conspired with the afore-mentioned defendants to assist in the illegal kidnapping of T.B;  and sought to deprive the claimants' biological and legal property from them by and through his inactions in 'defending' plaintiff E.B.  Mr. Mays also conspired with Price to alter and defraud the record of the court, and caused both plaintiffs much emotional pain and distress, which has continued for four long years.  Defendant Mays, thereby, is obviously engaged in RICO activities that are meant for no other purpose but to illicit funding falsely from the U.S. Government by and through the acts of stealing children from parents without merit and pawning them off to select foster families for the later purposes of adopting them.

f.  Concerning Defendant Rhinehart, Defendant Rhinehart supported, conspired and engaged in conspiracy to deprive the claimants of their rightful biological and legal property; thereby, is obviously engaged in RICO activities that are meant for no other purpose but to illicit funding falsely from the U.S. Government by and through the acts of stealing children from parents without merit and pawning them off to select foster families for the later purposes of adopting them.  Mrs. Rhinehart acted in violation of plaintiff Christopher's right to free speech by withholding his rights to see his legal property, by threatening to cut off his visits with his legal daughter.  Mrs. Rhinehart is also guilty of conspiring with defendants Nieman, Brownell, Price, Lancaster, Andrews and Gosch to have plaintiff Christopher arrested falsely on 2 separate occasions and sought to deprive both plaintiffs of their unalienable and Constitutionally provided rights to life, liberty and happiness.  Ms. Rhinehart also sought to conspire with defendants Price, Reed, Gosch and Brownell to falsify drug testing results meant to keep the plaintiffs in need of un-needed services and prove them unworthy to parent T.B. The defendant, Rhinehart, then, is also, by proxy, a member of a RICO organization, which operates under the guise of leadership, in order to defraud the U.S. Government of funding by stealing and adopting out children and conspiring to order services of parents that are not needed.  Mrs Rhinehart, is also, by proxy, guilty of conspiring to kidnap Elizabeth's rightful biological property.  Defendant Rhinehart did also violate plaintiff Christopher's right to free speech per the 1st amendment of the Constitution, utilizing threats that, if he didn't stop speaking freely, he would not be allowed to visit his daughter.  The claimants claim 4 years of mental anguish at the hands of Defendant Rhinehart. The plaintiffs also request the court to file charges of fraud, libel and slander, defamation and kidnapping charges against Ms. Rhinehart.

g. Concerning Defendant Anthony Reed, acting using color of law as a manager of Central Iowa Family Services, a DHS contracted "drug testing facility" for parents accused of drug use by the DHS, did, not once, but twice falsified testing done on BOTH claimants at different times; and engaged in perjury, libel and slander of the plaintiffs in order to affect the claimants and others to lose possession of their lawful, legal, and rightful biological property.  The claimants also state that, due to the facts as they have been presented, that the court find that he defendant, Anthony Reed, is also, by association, a member of a RICO organization, which operates under the guise of leadership, in order to defraud the U.S. Government of funding by stealing and adopting out children and conspiring to order services of parents that are not needed.  Mr. Reed, is also, by proxy, guilty of conspiring to kidnap Elizabeth's rightful biological property.  The claimants claim 4 years of mental anguish at the hands of Defendant Reed.

h. Concerning Defendant Katherine Walker, the claimants claim damage in fact that Ms. Walker did conspire and collude against the claimants right to parent their child, T.B., and against their right of due process, by meeting ex-parte with Defendant Price to work out a deal for her client to win out, knowing full well all that the claimants had endured at the hands of the afore-mentioned defendants.

61. In final, concerning the matter of C.B. allegedly harassing defendants Emily Nieman and Defendant Katie Gosch - because C.B. couldn't be located, and since no one that knew C.B. would turn him in (mainly because they all knew C.B. would never do what was alleged here), Defendant Jake Lancaster, Defendant Bell and Defendant Sarcone conspired together and turned to others in Government who might help.  After perusing C.B.'s entire blog, they found a single sentence that they could use, that quoted claimant Christopher as saying "I'm going to Washington D.C., and I'm going to camp out on Obama's doorstep until he does something about corruption in Iowa."  They then turned this over to the Secret Service, somehow convincing them that C.B. was a credible threat to the President of the United States. They did this because this agency had access and authority to ways that they could legally use to find C.B. that Defendant Jake Lancaster and the County Attorneys did not. The Secret Service agent assigned then located C.B. by his IP address, and had him arrested finally in Carroll, Iowa.

62. Upon his arrival in the Polk County Jail, the Secret Service agent interviewed C.B. for 2 minutes, then walked out on the interview after the agent discovered that this was all about C.B.'s stolen daughter and determined that C.B. was hardly a credible threat to anyone; let alone the President of the United States.

63. C.B. appeared before Judge Birkenholtz, District 5C the next morning and plead guilty to the two simple misdemeanors, to bring bail down to an amount claimant C.B. could reasonably pay quickly so as to get back home to work on beating this criminal case and his upcoming appeals.  This would be the SOLE purpose of the Plaintiff Christopher's guilty pleas to the 2 counts of 3rd degree harassment in AGCR 283733; NOT because he chose to admit guilt to the alleged charges.  Sometime later, when it would come time to address the alleged charge aggravated misdemeanor of harassment in the first degree of Ms. Nieman was pressed to the limit by C.B. in his motions to the court, and just a few days prior to trial (long after Christopher's arrest, and well after the termination hearing was over and the damage done), the charge of harassment in the 1st degree of Ms. Nieman was dropped suddenly by Kevin Bell (who, acting in his alleged capacity as an Assistant Polk County Attorney, and using color of law

to approve this phony charge in collusion with defendants Gosch, Nieman, Sarcone and Defendant Lancaster) with prejudice, on April 15th, 2015.  The victim impact statement from only Ms. Nieman (no VIS was ever filed by Defendant Gosch), and the pecuniary damages statement were both filed on a date well AFTER the charges were dropped, and the case was closed, on April 29th, 2015. Defendants Bell and Lancaster never had tangible evidence of the alleged 1st degree harassment charge of C.B. against Ms. Nieman; and claimed that they dropped the 1st degree harassment charge (where C.B. had allegedly "threatened to kill" Mrs. Nieman) because C.B. plead guilty to the two lesser charges of harassment 3rd (where C.B. allegedly just simply harassed the "victims"  somewhat and made them a little nervous, even though C.B. never actually spoke to either of the supposed "Victims" in those calls, but only left them a voice message).  Claimant Christopher states; in matter of absolute fact that this charge was only dropped by Defendant Bell and Ms. Nieman because it did not exist, and was not backed factually by any evidence, real or implied; and because of what all of the aforementioned defendants to this point in the claim had wanted (the claimants to miss their termination hearing without fail) had been accomplished.  It had already been accomplished by that time of Plaintiff Christopher's arrest, so this fact goes to show that the arrest was obviously an additional "lesson" to claimant Christopher to scare him away from further action against these same aforementioned defendants and their criminal organization.  The claimant, Christopher also states that there was an added and very important reason that this charge of alleged behavior on C.B.'s part also happened, and at this particular period of time and the date that the warrant was actually issued (a week before the scheduled termination hearing), because in the cross appeal and subsequent documents all filed by defendant Miller-Todd, (the claimants stopped counting at around 20 instances, covering around 5 different filings by defendant Miller-Todd) in the following appeal to the claimants termination case in the appellate courts, and while acting using color of law in her alleged position as an assistant Attorney General working under the attorney general's office in Iowa; that, because the claimants did not attend their termination of parental rights hearing; (and, also, because C.B. was wrongfully and unlawfully dismissed by the defendants Price and Brownell as an interested party in the CINA case (JVJV237203), that neither claimant had any standing to appeal the matter to the Iowa Supreme Court (this is evidently a section of an Iowa Code addressing appeals made to terminations involving the rights and penalties of parents who do not appear for this hearing).  The claimants state, therefore, that an obvious conspiracy occurred between ALL of the aforementioned defendants to cause the claimants fear and to cause them to fear to appear and be immediately arrested at their termination hearing, and so that the aforementioned defendants could lawfully utilize this particular Iowa Statute in depriving the claimants standing in their appeal to the termination of their parental rights, and in order to avoid having their crimes discovered by those of the Iowa Supreme Court in that appeal.

64.   Hereafter, in claim of damage of more mentioned to this point in this claim, the claimants state, in fact:

   a.   Concerning Defendant Jake Lancaster, the claimants state that Mr. Lancaster did conspire with John P. Sarcone, Kevin Brownell, William Price, Katie Gosch, Emily Nieman and Kevin Bell (defendants) to falsely accuse Plaintiff C.B. of Harassment in the first and 3rd degrees, in order to affect both claimants' non-appearance at their all-important termination hearing by issuing a warrant for plaintiff at a time quite close and prior to this hearing; for crimes that had allegedly happened from July 21st, 2014 until February 17th, 2015 (how could

harassment of Defendant Gosch possibly be claimed against either claimant, during this time, when she was supposed to be acting, using color of law, in her alleged and assigned capacity as our active caseworker?), and a single crime of 1st degree harassment that did NOT HAPPEN OR EXIST, nor was any such threat literally spoken or implied; and for which the defendant Nieman nor Bell had any real proof of this crime to speak of, nor was any such proof ever filed in the case; only stated to be fact by Ms. Nieman in her VIS, AFTER the case was closed.  Mr. Lancaster is also guilty in this concerted and conspiracy-ridden effort to arrest plaintiff Christopher, of libel and slander, in that he ran Plaintiff Christopher's name 'through the mud' on his police website, on Channel 13's news station and in CityView magazine as the #1 wanted criminal for nearly a month's time, ahead of murderers and felons, in order to accomplish this false arrest.  Mr. Lancaster then filed false report to the U.S. Secret Service, in collusion with John Sarcone and Kevin Bell in order to accomplish this arrest, way above and beyond any reasonable or normal procedures would be by someone allegedly operating using color of law and working for the city as a Des Moines City Police Officer; or would reasonably be executed or required in a case with alleged crimes as petty and insignificant as these.

b.  To the matter of Defendant Bell, the claimant Christopher states damage in fact that Mr. Bell, using color of law and acting in his alleged official capacity as "Assistant Polk County Attorney", with no true power or authority granted him by the Republic or agent representing the same Republic, and as an alleged "employee" or "Assistant Attorney" of the County of Polk, Iowa; conspired with both Defendant John Sarcone (someone using the color of law under an authority not granted him by the Republic, or an agent thereof, but allegedly granted him by the County of Polk, Iowa in his alleged position as the "County Attorney" working for the County of Polk, Iowa) and Defendant Lancaster, Katie Gosch and defendant Nieman, who also used color of law and their alleged capacity and alleged granted authorities to deny and deprive Claimant C.B. of his Civil rights; and their respectively alleged and supposedly granted "power and/or authority" allegedly given them by the City of Des Moines and the State of Iowa; in order to affect the false arrest of Plaintiff Christopher so as to deprive C.B. of his legal, lawful, civil, due process, Constitutional and unalienable rights and his standing as the legal father in his termination hearing (see Section 'a.', this subsection, this claim, #); using fake reports and approving false charges with no basis in fact or law.  Mr. Bell is also guilty of libel and slander and conspired with his boss and Mr. Lancaster to file false report to the U.S. Secret Service, in order to accomplish this arrest, way above and beyond any reasonable or normal procedures or lengths a reasonable person would go to, in order to affect an arrest for someone alleged with these minor crimes.  Hence, using the facts as they have been related to this court by the claimants up to this time, serves to show a meeting of several of the defendant's minds and presents easily motive, purpose and conspiracy occurred as described, listed and alleged in this claim's afore-stated facts; in an obvious attempt by these same named defendants to affect fear in both the claimants, C.B. and E.B., and to make them afraid to come and appear in representation of themselves at their termination hearing, which would effectively serve to fulfil their motives in that it would:  a.  Allow these criminal defendants to be able to show that the claimants had no standing to appeal their termination decision to the appellate courts of Iowa; b.  Would give the same defendants motive, time and opportunity to fabricate the events that did not occurr in the claimant's missed termination hearing using false transcriptions and in falsifying and defrauding the record of the court); and ultimately; would assist in c.  completely allowing this corrupt court and the DHS to cover up their

obvious unlawful and criminal actions against the plaintiffs; and thereby accomplish
effectively giving some breathing room to this well-ordered and practiced organization and
it's participants (i.e., the aforementioned defendants).

65. On July 5th and 6th, 2015 (purposely postponed several times until well AFTER their
termination hearing), an appeal to the child protective assessment of the claimants was held in
front of an ALJ, at the Department of Human Services. Grant Dugdale (acting under color of
law in his alleged position as the Assistant Attorney General for the State of Iowa with no
granted authority) defended Ms. Nieman. After 2 days and 40 witnesses testified for the
claimants; the ALJ ruled in the claimants' favor on all matters, ordered that all their records be
expunged, and that claimants be removed from the central abuse registry. The matter was
then appealed up to the Director of the Department of Human Services at that time, Charles
Palmer, by the AG's office (unnecessarily) and he would uphold the same ruling, again in the
claimants' favor.  Defendant Emily Nieman, the defendant who originally removed T.B.
unlawfully from E.B. (See claim #'s 1-4), testified in this assessment appeal (during her
questioning by plaintiff C.B., who chose to also represent himself in THIS matter) that she
(Defendant Nieman) had no experience with newborns whatsoever up to and including the
removal of T.B., and also that T.B. had been her FIRST removal of ANY child from a family. The
Claimants are forced to wonder how a woman with no experience with newborn babies
whatsoever could be employed and able to correctly identify and prove alleged neglect or
abuse of a newborn baby by anyone in their lives; or be allowed or granted any kind of
authority to remove the same newborn child with her non-experience.

66. Also during this hearing, Defendant Reed of Central Iowa Family Services, also during
questioning by C.B.;  would unlawfully commit perjury under oath and state that, when he
appeared at the hearing he was subpoenaed to testify at, on December 18th, 2014, (see claim
#27) that, prior to this hearing; he didn't even know who either Defendants Katie Gosch or Ms.
Rhinehart were; and had just met them during that hearing; (though he sat directly beside
them during the entire hearing, and afterwards, and, it would be Mrs. Rhinehart,  in her
obvious and complete familiarity with defendant Reed, who would introduce him to C.B., after
the hearing and prior to the field test for drug use.) This testimony, if true (which of course, it
is not), would lead a reasonable and logical person to conclude that Mr. Reed expected them
to believe that, because 'someone' from his facility (not him, specifically) had been
subpoenaed to come and testify at this hearing, Mr. Reed decided that he would represent
this branch in Des Moines at this hearing, dropped all he had going on (as a JCO, and as the
manager of each and every drug testing facility for DHS all over the State of Iowa), drove 74
miles from Eldora Iowa to Des Moines, Iowa and showed up personally - for no other stated
reason but to testify on the behalf of the Des Moines branch (Central Iowa Family Serivces),
one of evidently a good number of branches that he allegedly manages; in order to give some
un-identified testimony in defense of this Des Moines Branch; at some hearing, involving some
person (the claimant Christopher, specifically) he neither knows, or knows about.  To claim he
didn't know these defendants Gosch and Rhinehart, he then is also claiming in fact to have had
no pre-knowledge of claimant Christopher or his case either, should you believe this
testimony. In order to further out the dishonest testimony of Defendant Reed in front of the
ALJ, you would also need to believe that this testified to "random act of kindness" for these
defendants that he had seemingly "Just met" at that time; is an activity that Mr. Reed
(evidently) engages in quite often, in his apparently abundant spare time, for personal
recreation.  C.B. states, as an absolute and obvious fact, that Mr. Reed and Ms. Rhinehart,

along with Ms. Gosch, and defendants Price and Brownell, had already conspired together and planned this "random event" well ahead of time; more than likely and reasonably assumed to be just after the phone call plaintiff C.B. made to defendant Brownell the previous day; and planned to once again falsify any results that came from that test; in order to finally be able to legally and lawfully show the claimants in need of ordered and unnecessary 'services.', and later, to use as a good and lawful reason to continue in their planned termination of these claimants rights at a later date.  Mr. Reed showed up personally, and very much uncoincidentally, because he wanted a chance to get back at C.B. in repayment of the following event, which is meticulously related in the plaintiff Christopher's online blog to this day:  Plaintiff C.B., in an article that directly followed the claimants' first hair follicle test for drug use,, described in detail the unconventional methods used in acquiring testing samples from clients and the un-sanitized, non-standardized and unacceptable condition of Mr. Reed's "Drug Testing operation", doing business as "Central Iowa Family Services", on Merle Hay Rd. in Des Moines Iowa; and the unprofessional procedures performed in the taking of samples from the claimants during their individual testings.  Mr. Reed was then forced to completely renovate his operation in Des Moines after this article published, in order to conform to drug testing site standards and to be able to pass any kind of possible inspection that might occur because of facts and claims that were made and alleged in plaintiff Christopher's article.

67.  The claimants state that the transcripts to the termination hearing, allegedly transcribed by an official court transcriber and on the record at the Polk County Courthouse, involving aforementioned defendants Price, Walker, Brownell, White, Gosch, Andrews (now Cronbaugh) and the transcriber, all claiming to be in attendance in this hearing, allegedly held, heard and decided by Defendant Price (who was acting, using color of law, in his alleged granted position and authority as a "judge" working for "The State of Iowa") and claimed, by these mentioned defendants, to have been allegedly addressed and decided on the date of February 28th, 2014; in the absence of either claimant, is alleged by these claimants to be a complete fabrication and designed by the named defendants after they did conspire to wrongfully and unlawfully claim to attend and decide the unwarranted fate of the claimants and their "neglected" daughter. Defendant Paul White, who never once said more than two words in any one previously held hearing; who did absolutely nothing to help his client, T.B. or the claimants in the named defendants false effort to "reunify" them as a family, who didn't ever once speak, in person at any hearing, by phone or even once by mail or email directly to either claimant ever, allegedly waxed eloquently concerning this family to defendant Price's circus-like court for a full 3 pages or better in these transcripts, and supposedly with great remorse, expressed his opinion concerning the claimants and their daughter. This alone is enough to convince the claimants of the complete fabrication of the entire hearing, long before reaching the numerous instances of sincere heartfelt and regret-filled words allegedly spoken by Defendant Price in these hearing transcripts; a man who never had a single kind word, respect or feeling for or towards anything or anyone, ever; and whose words fairly dribbled with condescension and sarcasm at all times towards any (who wasn't of either his level or of his profession) who would dare speak to him from the floor of his courtroom; under normal circumstances. Anyone who had ever been in a courtroom or would have even known or been at all familiar with ANY of these afore-mentioned and named defendants, simply by only reading what was allegedly said by any of them in these claimants' termination hearing transcripts, would instantly have testified that no one of the same defendants had said anything allegedly said in this hearing or had acted as they are shown to act in this same hearing.  NOTE: It's important to mention that the defendants, after this "hearing" allegedly occurred, had nearly a full 9

months with which to totally invent, alter or fabricate these transcripts to say just about anything had been said, or had occurred; before it would be required to be sent to the appellate court of Iowa.  This gave the defendants named as being in attendance more than ample time to conspire and completely fabricate the events of this hearing and get them properly transcribed to state what they wanted said and done in it; and this is made doubly probable, due to neither claimant having attended; for obvious reasons.  This opportunity, this non-attended and non-existent court hearing, created wholly in conspiracy by the afore-mentioned and individually named defendants, would also serve the purpose of better and further covering up any unlawful actions taken against the claimants up to this point, in and through their allegedly justified legal claim that would be more than reasonably, even massively OVER-stated in just about very filing of the AG's office in their cross appeal:  their claim that the neither C.B. or E.B. would have standing to appeal because of this non-appearance; and were confident that this would stop the consideration of said appeal before it even began.

68.   On appeal to the Iowa Appellate division, the Appellate court blatantly refused to stay our terminations based on the assessment appeal decision of the ALJ and the Director of the Department of Human Services, even though the decisions made were FINAL, and more than determined that, initially, the child was wrongfully found to be in need of the removal or in need of the court's intervention; and that DHS had made a mistake taking her. This decision of the Department that had removed T.B. should have, by all logic, nullified anything that was ruled or decided afterwards, including all orders given by Defendant Price from the time of the removal, on. These decisions of the director and the ALJ were submitted 3 times, and the appellate courts would deny the stay 3 times, long before they would even consider the case. Later, they refused to pay for the transcripts using state expense, that concerned anything other than the termination hearing unless the claimants paid for them themselves, which came to around $1,000. The claimants were given only 2 weeks following this order before they began their consideration of the appeal, depriving the claimants of time necessary to get any money together to pay for them; thereby and therein depriving them of their deserved due process.  Naturally, just after this 2-week time allotted, consideration began on the case immediately.  Since events occurring up to the termination would no longer be a problem because the claimants couldn't afford to pay for those transcripts, the appellate court would then rule in full agreement with the district court; in total disregard of all of the district court's actions against them. New evidence (the 18 minute recording of the worker breaking several federal laws in removing T.B. from the mother) was then entered by us in the form of and included with an answer to their decision; This was the same evidence claimants had filed in the juvenile cases; the same was purposefully never admitted and subsequently disposed of and not at all entered onto the record by the State's juvenile clerk of court employees (even though claimant C.B. had come in person to file it), and never admitted in the case, but sat on the shelves in their offices for a total of six days, and was then either destroyed as soon as the hearing ended and plaintiff Christopher was (immediately following this hearing) unindexed from having access to the case.  The appellate court followed the District Court's lead and conspired with the aforementioned defendants named up to this point, for the best and most efficient means to further cover up these defendant's mishandling of the entire case on appeal; and effectively refused to admit that all the courts and those involved had done was wrong, In turn, the appellate court ALSO rejected the same recording, filed and identified as new evidence, and ruled that it was nothing short of a sad attempt by the claimants to get them to reconsider their final decision, even though such "new evidence", in a court of

criminal proceedings would have been powerful enough to warrant a whole new trial. This decision, of course, came to the claimants almost a full year and 3 months after they filed it on appeal, very nearly 2 full years of the very first part of the claimants' daughter's life.

69.   Finally, concerning the Iowa Supreme Court appeal, the claimants believe that the matter of their case and all the atrocious behaviors and actions of all who were involved in unison against them and their claimed unalienable rights as parents, involved against them, in order to, initially anyway, claim that we were unacceptable parents and people in every imaginable way, in order to seem justified in later terminating their rights, then place our daughter out to the foster parents, who we're certain, had their eye on T.B. and didn't rule her out as a good addition to their ever growing adoption income. The claimants are also sure that they were DHS's first and foremost choice for placement, but DHS had been forced to take a lawful detour when someone of the family, closely related by blood (R.S., the biological father) came in, however late, armed with a real paid lawyer (one not in on the scheme...until the termination, anyway); had an acceptable rate of pay (among defendant Price's very first questions he asked of R.S. was where he was employed, and "How much money do you make there?"), then their plan was forced to change.  R.S., who was single, and who had a record of OWI and assault charges (the claimants had no record, at this point) was ruled by defendant Price to be a much better, as well as an above and beyond perfect choice to raise this child, over the married parents.

70.   The Claimants state damage in fact, then, against these defendants:

   a.   Grant Dugdale, while engaged in acting, using color of law as an alleged "assistant AG" for the State of Iowa, did conspire with Ms. Nieman to further libel and slander the defendant's names in a hearing in front of an ALJ of DHS in order to unnecessarily prove Ms. Nieman's "Child Protective Assessment" of the claimants as "Founded,", and would have, had it not been resolved, caused both claimants to remain on the Iowa Abuse Registry for 10 years. After it was ruled to be "Unfounded," Mr. Dugdale appealed that decision up to the Director of DHS at the time, Mr. Palmer, now the ex-director, to further torture the plaintiffs further and unnecessarily; in order to cause them further pain and suffering.  The plaintiffs ask the court to grant relief to the claimants for 3 years of emotional distress and pain and suffering at the hands of Mr. Dugdale, and file conspiracy charges against him.

   b.   Concerning Defendant Katherine Miller-Todd (who, acting in her alleged position of an assistant Attorney General for the State of Iowa, using color of law, as well as authority not granted her by an agency of Government, or an agent thereof of the Republic), the claimants ask relief for their pain, suffering and mental anguish, caused by her using color of law, in that Ms. Miller-Todd conspired with the defending parties afore-mentioned, and the appellate judges involved in the appeal to the claimants' termination of parental rights; essentially affect the permanent lawful, Constitutional and unalienable rights of the claimants to parent their daughter, T.B., without just cause.

71.   Herein, then, concerning all these facts stated prior, It should not be difficult for this court to find that a most definitive meeting of the minds and conspiracy occurred between all that have been mentioned thus far in this Claim, as defendants.

72.  During the year and a half that the claimants waited for the Appellate court to address the termination appeal; C.B. had been continuously sending emails containing relevant news and clippings, recordings of legal atrocities, paperwork and proof of what was happening to the claimants' family, as well as things that were happening to other families all over Iowa, to Darren Tromblay, the then Editor-In-Chief at CityView magazine in Des Moines, Iowa. Emails were also being sent to all who had been involved in their criminal actions against us at the same time. At no time during this period did anyone ever respond or ask/tell claimant Christopher to ever to stop sending them these things, and Mr. Tromblay even began to respond to them favorably, from time to time. Finally, in November of 2015, Mr. Tromblay would send C.B. a reply to an email that he had sent him, and asked C.B. to give him a call. C.B. did, and Mr. Tromblay mentioned that he thought they could do a story on this.  He would then mention that, since there were an awful lot of facts and elements to this story, that he and C.B. would need to go through it all to sort out what Tromblay would need and what he wouldn't be able to use. He then sent C.B. a follow-up email, signed with a digitally produced signature, that clearly stated his intention to send a reporter of his, Jeffrey Pitts, in his direction in order to get the story going; very soon, and in order to set up a meeting of the two to decide what C.B. would give him for the story (there is no vagueness in the language, no "maybe"…that he was certainly going to run a story.)  Also included in that email was a clear threat:  That C.B. was not to, at any time, push defendant Tromblay or Jeffrey Pitts, then a reporter, in getting the story done, or Mr. Tromblay would file charges on C.B.  Nearly two months later, in January, 2015, C.B. contacted Mr. Tromblay twice by email in quick succession to ask, somewhat angrily, what the big delay was, and mentioned that he had heard nothing from either of these defendants at all.  C.B. then heard nothing back from Mr. Tromblay following those emails being sent out, and on January 21st, 2016, members of the Carroll City Police, including Officer Gary Bellinghausen, were again knocking at the claimants' door.

73.  E.B. answered the front door, and with the door shut, asked who it was. There were two people present, and one identified themselves as representatives of the City of Carroll City Police. E.B. then asked these men for their identification and a warrant of arrest. They stated that there was a warrant for arrest, but that they didn't have it with them.  She then told them that they would have to produce this warrant, then politely asked them to leave the property. The officers obliged her and left.

74.  Posted on both doors of the home, for months prior to this time, at both the front and back doors, both the inner and outer doors on both sides of that door, and all throughout the home was a sign that requested that all who came onto the claimants' property or their place of residence, purporting to be law enforcement or claiming to be associated with any government agency therewith, who came with the intent to enter onto the premises was required to produce official documentation that proved who they were, and their lawful purpose to come onto the property, with or without a warrant. It also stated that, should they choose to not provide what the claimants were, in effect, asking them for, and they would then opt to enter the property of their own volition regardless, that in doing so, they would be agreeing to enter into contract with the claimants; and in so doing, would also agree to pay the same a land use fee at the agreed upon rate of $10,000 per person, per day, or any portion of that day. This sign was printed in bold black and white, took up the size of an entire 8"x11" page, and was posted at eye level, so that none would miss it. NOTE: On the date of C.B.'s 2nd arrest, just a few days after this arrest, the officers who came that day childishly ripped these signs off of the doors, prior to knocking on them.

75. Upon their return 20 minutes later, the alleged "officers" once again knocked at the front door. E.B. then asked to see a warrant, and when she was satisfied that what the men were holding was a warrant, she then opened the inner front door to the property, and walked away from it; not saying a single word, without giving them express permission to enter, and without inviting the men in. These men then moved to open the outside screen door with the obvious intent of consenting to our contract's obvious and clearly defined terms; and in the oppositional and subsequent act of totally ignoring and withholding from the claimants what this contract asked of them clearly and politely to produce before such an entry.  This contract was 100% visible and couldn't possibly be missed anywhere on this property, and it was broad daylight at the time of the violation of our home by these defendants.   It had also clearly stated the amount of our land use fee, as well as the manner it was to be paid to us; and blatantly included the request for their identification, and yet they would still act in consent, and enter the premises on their own anyway.  Following this act, they then proceeded immediately to the person of plaintiff Christopher, and inquired as to whether the plaintiff was Christopher Bruce, as he was sitting close to the front door as they entered. Plaintiff C.B. informed these people that he was not that person.  Defendant Gary Bellinghausen, (who was acting under color of law as a peace officer who worked for the City Department of the City of Carroll Police Department) would then step forward, and state "You ARE Christopher Bruce, and you're under arrest." He then handcuffed C.B. without checking for proper identification; and ignored his stated dispute against all reason and took claimant Christopher to the Carroll County Jail and put him behind bars to await transport to the Polk County Jail by the Johnston, Iowa City Police Department.

76. This arrest took place in the afternoon on January 21st. The transport from Johnston Iowa took around an hour to arrive. The transport by the Des Moines Police Dept., a year earlier, had taken around an hour to arrive from Des Moines to Carroll, Iowa as well. This is mentioned to show the reason that the transport, one that would take nearly four and a half hours to arrive for plaintiff Christopher's arrest on January 25th, four days later, would take this long for a very obvious reason.

77. After his release, Plaintiff Christopher was arrested again within a couple of days of the first arrest on January 21st, 2015; on January 25th, 2015 and was subsequently found to be guilty of the crimes that had been charged against him by Defendant Jeanne Munson), then was sentenced to do a year in the Polk County Jail.   at some point of his incarceration, plaintiff Christopher discovered; via the watchful eye of a friend of his who had been allowed into his e-file account for only filing paperwork purposes; that the warrant used to arrest him, supposedly in the possession of Defendant Gary Bellinghausen, was NOT an arrest warrant, but was a search warrant. At no time did Defendant Bellinghausen "search" any portion of the property. He came in, made his false identification of C.B., arrested him without verifying his identity, and did not ever touch anything else in or on the property. The warrant used then is no longer the warrant shown in this case and cannot be accessed or downloaded by C.B. from E-File.

78. The claimant presents that Defendant Gary Bellinghausen was in charge of the operation resulting in C.B.'s arrest at the claimant's property, and that Defendant Gary Bellinghausen is wholly responsible for the debt he incurred by contracting with the claimants, the current

residents of the property at that time, by willfully entering their home of his own volition, after being duly warned of the consequences; without invitation and using an illegal warrant to do so. Claimant Christopher has concluded this as fact, in that a. Defendant Bellinghausen had been the first and only officer to speak the entire time, b.  Gary Bellinghausen willfully accepted the liability of C.B.'s welfare by taking the action of placing him in handcuffs in order to complete this unlawful arrest; and c. there were, at final count, two officers who had entered the property at that time; and, thereby, Defendant Bellinghausen did, by engaging in these actions, choose to claim responsibility for their intrusion onto the property, and is in debt to the claimants for the land use fee in the agreed upon total amount of $20,000, upon our demand, and in legal tender.  The claimants now so demand.  Mr. Bellinghausen did damage the claimants by forcing their way into the claimants' home without permission and without invitation and would not provide the claimants with the proof asked for by this sign/contract; of their identification, in order for the claimants to have the ability to protect themselves from those who would claim to uphold the law, but generally do not do anything of the sort.

79. Important to note at this point, that up to; including and even exceeding the period of time the claimant, Christopher was first arrested because of the Tromblay/Pitts matter; the claimant began noticing strange and seemingly unexplainable things that were occurring, that, to the plaintiff, clearly pointed to obvious actions taken against Claimant Christopher by defendant John. P. Sarcone, upon further investigation and diligent observation.  On or around April of 2015, until the present day, emails that were being sent to him directly would be opened by him at, say, 9:00 a.m. in Des Moines, Iowa. Five or so minutes later, at 9:05 a.m. the same day, the same email would be opened by this same defendant in Omaha, Nebraska, obviously where the defendant was not present.  C.B. has a program that tells him where all of his emails are being opened, by whom, and how many times, and when. He then started noticing the same emails being opened in other major cities at various times, by the same recipient - Kansas City, Minneapolis, St. Louis, MO; etc., all cities in the immediate and close vicinity of Des Moines. Upon further research, it was discovered that not only had C.B.'s computer been connected to these same cities in his network connections (on his personal computer), directly; but that Facebook and Google were continually giving him alerts, stating that these locations were also logging into his computer and social media accounts online. Upon even more research, it was discovered that every city listed had a rather large branch or resident office of the FBI located in it. (There was a year's reprieve of this activity, during the time C.B. was jailed.) Following this inactive period, and upon and following sending certified letters of settlement to John Sarcone (prior to this action, something normally done by attorneys or pro se litigants who are about to file actions in federal court against them) to the same email address; the same activity began again; as openings of C.B.'s emails occurring as far away as Massachusetts and Texas, after a year of not seeing any activity, and just after it was certain that Mr. Sarcone had, on that same day, received his letter certified mail.  It is stated by C.B. as fact, for Mr. Sarcone to get rid of C.B. once and for all, the County attorney has taken to calling just about every office branch of the FBI or comparable agency in the last three years, in an attempt to have C.B. investigated or federally arrested, for no crime that C.B. had committed; save exposing Mr. Sarcone's illegal activities.

80. On the date of January 24th, the day following C.B.'s bonded release for the harassment of Darren Tromblay, the claimant posted a story concerning one Theodore Booker, a fellow warrior against child trafficking; and posted it on his blog. Upon investigation of the website

for the DCFS offices in Los Angeles, C.B. located a folder, shown publicly on their branch site for L.A. County, which contained the names, phone numbers and email addresses for every social worker in L.A. county, CA. After posting Theodore's story, C.B. then emailed every one of the 8000 social workers that worked for DCFS, to let them know that their crimes against Theodore Booker were online for the world to see.

81.   On January 24th, C.B. had also involved himself in a case in Carroll County, where he resided, where a child had been wrongfully taken from a family there. On the same day, C.B.'s friend, Theodore Booker, was arrested in L.A. County, for no charges that were ever filed against him for 7 months, using affidavits filed by those of the LA County DCFS offices, and that had C.B.'s name on them. Mr. Booker was released a few months later, with no actual charges that were truth, and, of course, no real convictions.

82.   On January 25th, 2016, The Carroll Police showed up at C.B.'s house again, acting and operating under color of law; with a warrant for his arrest, using a single aggravated misdemeanor charge of harassment in the first degree, with the alleged victim being one Defendant Jeanne Munson of Altoona, Iowa. This incident with Ms. Munson had allegedly occurred nearly a month before the charge was approved by the county attorney's office in Polk County; and it had, also, been nearly a month after the police in Altoona, Iowa had filed the police report alleging the same crime.  It's obvious that, if this had ever been a crime that C.B. would someday be arrested for, it would have happened long before his arrest on this day; or would have been brought against him while he was already in custody, just a couple days before this, for his alleged harassment of Darren Tromblay.  This arrest, then, in conclusion and considering the facts aforementioned; most certainly occurred for no other reason than what had happened with the DCFS offices in Los Angeles; as well as what had already occurred in C.B.'s newly formed war with his local DHS office in Carroll, Iowa.  Since neither the County Attorney, John Sarcone or D.C.F.S. could rightfully charge C.B. with speaking freely, or accuse him of using email addresses that he'd found in a folder that was publicly available on D.C.F.S.'s own website, the D.C.F.S. instead scoured C.B.'s blog (C.B. had listed, at the top of every email he sent out, the address to Theodore Booker's story) to find the one person who would appear to be C.B.'s most troublesome enemy in his state, someone whose name was mentioned in nearly every article C.B. had written about his cases: County Attorney John P. Sarcone. D.C.F.S. then contacted Sarcone for help in dealing with C.B. in Iowa. Sarcone, in turn, would then search records of the reports filed by surrounding police departments, to find a report of some crime they could charge C.B. with. Hence, the involvement of the Altoona Police Department, and their contrived "victim", Jeanne Munson, came to bear. C.B. would later discover that Ms. Munson had been involved in a deal with Charles Palmer, the director of DHS, and had been working with him to cause dissent in her Iowa-related group on Facebook, called "Protest Iowa." Her job had been to subvert those that sought her help, as well as discredit and slander others that they might seek help from. The Department had removed Ms. Munson's grandchildren from her care at some point prior. It was then that Ms. Munson had started and had become the administrator for a large group of 9000+ parents that had been leading the war with others that had also been wrongfully victimized by DHS in Iowa. Charles Palmer had, along the way, sought Ms. Munson out, since she was the administrator of the only Iowa group against him, and made a deal with her, offering her and others to once again be allowed to visit with their children and grandchildren; and in exchange, Ms. Munson, her boyfriend, Mark Worthington (a bail bondsman in Des Moines), and Linda Downs (these were the agents we knew of. It's likely that there were more

than this) would give the victims of Iowa DHS mis-direction in legal matters and cut them off from people who were legitimately attempting to help them by slandering them in their group, like C.B. for instance; which duly served to explain to him why Ms. Munson and he had all of a sudden come to war against each other; after an amicable relationship of nearly a year, prior to that time. As even more proof of her collusion with the DHS, Ms. Munson, after heading up this Facebook group for years, would, after the conclusion of this case (and also after C.B. provided enough proof on Facebook showing her, Mark Worthington and Linda Down's collusion with the DHS and the Defendant John P. Sarcone in having C.B. arrested, then placed in the Polk County Jail for a year) suddenly shut down "Protest Iowa;" and her and Linda Downs were never heard from in this medium again, though both were large in the fight to begin with.  Mark Worthington still, to this day, harasses C.B., and no charges have ever been filed, though he has been as guilty, if not more so, of threatening the lives of C.B. and E.B. on several occasions.  These two people, Munson and Downs; one a defendant named in this claim, have been shown more than once to be in collusion with the defendants; and his is proven in their actions and attitudes against the Plaintiffs; especially in the arrest and kangaroo conviction of C.B. in the felony case FECR292312, which placed plaintiff Christopher in jail wrongfully for a year of his life, without just cause.

83. Upon C.B.'s arrest on this occasion, there was only the Harassment charge; and C.B. was taken once again to the Carroll County Jail to await transport to the Polk County Jail. Strangely, unlike the other two times, where the transport took only an hour to arrive, this transport would take four and a half hours. The reason for this would soon come clear. C.B. had called Kenny's Bail Bonds and found out that his bail for the harassment charge was just $200 dollars. C.B. then told him he would give him a call once he arrived in Des Moines. While C.B. waited, defendant Alyssa Wilson, posing and acting under color of law as an officer of the law in Altoona Iowa, would, at the behest of Defendant John P. Sarcone, file two more police reports on C.B.; one for Stalking, another Aggravated Misdemeanor charge, and a Class D Felony, Threats; during the excessively long time C.B. awaited his transport to Des Moines.  By the time C.B. finally arrived in Des Moines and called his Bondsman again, C.B.'s bond had shot up to $70,000, and would now require a home to guarantee C.B.'s release.  Under normal circumstances, C.B.'s bond would have been no more than $9,000 ($2,000 for each aggravated misdemeanor, and $5,000 for the Class D felony). This excessive bond was "justified", Sarcone and others would state; because C.B. had, at this time, an "extensive criminal history", which consisted of only the 2 plead to convictions of the two simple misdemeanors of harassment of defendants Gosch and Nieman from the year before (see claim #'s 42, 43 and 46-48, above) and 3 other simple misdemeanors over a 50+-year lifetime, all unrelated to the current charges, and all non-violent in nature.

84. As to other reasons this amount might be applied to a criminal defendant reasonably; C.B. has always shown up for court appearances, has never skipped out on bond or bail, had never been on or violated terms of a parole or probation, and had never tried to elude those of law enforcement. Most of all, C.B. had never contacted any protected party of any "no contact order" (i.e, Emily Nieman and Katie Gosch), even after this "protection" was lifted.  As to Ms. Munson and her claim against C.B., the claimant, while in commission of the alleged charges, called her several times on one day. It had been months since he had last spoken to her, and C.B., to this day, has never contacted her again since; so it was apparent that there was no real danger of the crime alleged occurring again, should the claimant have remained free. Munson would later testify at trial that she was terrorized by C.B. and was in real fear of her life, but no

charges were filed for a month, but did happen to occur the day following C.B.'s emails to those D.C.F.S. offices in California, and just after all that happened in Carroll, Iowa. This clearly shows, because of the facts of this matter stated thus far; that this arrest only occurred as all involved and afore-mentioned, conspired against C.B. with the D.C.F.S. offices in L.A. County; and, considering how C.B. managed to bail out easily for the prior arrest (following the filing of a report by CityView employees and Defendants Pitts and Tromblay), something more drastic had to be done by the County Attorney's offices (namely, John P. Sarcone) to insure C.B. didn't bond out easily this time. This unreasonable bail, then, was unconstitutionally imposed against C.B. by John P. Sarcone, in and through his assistant, Linda Lane, and enforced by Carol Egly; also in collusion with the afore-mentioned defendants, in obvious violation of C.B.'s rights under both the U.S. and Iowa Constitutions, concerning imposing excessive bonds/bails and fees.

85.   On January 27th, 2016, C.B. would appear before Defendant Carol S. Egly, who, using color of law was acting in her "official capacity" as "judge and employee" for the State of Iowa; in an initial appearance. During this appearance, C.B. did claim that Ms. Egly did not have jurisdiction to hear his case and challenged it. C.B. also refused to enter a plea, and, because of Iowa's rules, they would then unlawfully enter C.B.'s plea for him, without his consent. C.B. also stated to Egly that his lawful name was not Christopher Bruce, but was Christopher, the living man, and that he was no longer a U.S. Citizen, and that Ms. Egly had no rightful jurisdiction over him in that way, either; unless specific damage to a person or a person could be brought by someone C.B. could counter-claim against; and who could state the damage in fact.   Defendant Egly would ignore this challenge and continued to blithely state the hearing date for which the matter would be heard, concerning the charges brought. As the hearing neared its end, the associate judge sitting next to Ms. Egly nudged her, while reminding her that C.B. had challenged her jurisdiction over him. She ignored her as well, and dismissed C.B. She would not address the challenge until nearly three weeks later, in a hearing held in front of her, to determine Jurisdiction, and concerning that challenge. Defendant Egly would state that C.B.'s charges fell under a "State" Jurisdiction. No proof of Jurisdiction was offered C.B., merely stated. C.B. then stated that the matter was a conflict of interest; due to the fact that the State was hearing the case, the State was prosecuting the case, and the State was also a claiming to be a injured party in the case, and was seeking remedy in the place of the alleged "victim." and "The State of Iowa," as if representing damage of the whole state. Defendant Egly would then state "That's an interesting theory Mr. Bruce", claimed that all was proper, and that the matter would proceed as they had scheduled it.

86.   C.B. chose to represent himself pro se in all matters. He would file a motion for a jury to hear the matter concerning the harassment of Darren Tromblay, within the allotted period of 10 days of his appearance, plenty of time for this to be filed. After the filing, Linda Lane, the Assistant County attorney in charge of all of the cases following C.B.'s initial 2016 arrest, the harassment case; involving Darren Tromblay case; the felony case; and another case involving three simple misdemeanors charged against C.B. later that year; would then motion to combine the case numbers assigned to the felony and misdemeanor charges. There was, in these cases, filed by C.B., ordered of the clerk to be filed in ALL of C.B.'s active and open cases; a motion for ALL MATTERS to be jury trials, including the Tromblay case.  C.B. specifically asked the clerk to file this in the lesser case for him, since C.B. hadn't received any documents concerning this case as yet and didn't know the case number. Plaintiff C.B. knows this request was read, because in the same sentence, C.B. also asked that this motion be filed by the clerk;

in ALL of his open and active cases, to ensure that the request would be filed in the Tromblay case as well. This motion, in the misdemeanor case, was lost (or possibly not lost, actually, at all) in the shuffle of combining case numbers and now did not show as being filed in the Tromblay case at all, only in the cases where such a request would be moot, because a jury trial would be the obvious and ONLY option. On the hearing to hear the challenge of jurisdiction, Carol Egly did inform C.B., after her unlawful decision concerning her jurisdiction over C.B.; that there was to be a non-jury trial that would be held on March 3rd, 2016.  C.B. did, then, object to Ms. Egly's statement; and did relate to her that a motion had been filed in ALL cases, requesting jury trials in ALL the open matters currently in force.  Defendant Egly would then state that it was now too late for a jury trial in this case and denied C.B. his right to a fair and impartial jury of his peers; even though the motion had indeed been filed in sufficient time; but had been then, allegedly, "misplaced" due to the combination of cases. The cases that were being combined, allegedly, were case #'s FECR292312 and AGCR292141, neither of which involved the Tromblay matter, case SMAC359086; so the plaintiff has to wonder how it was that a motion that was supposed to be filed in every active case, asking for a trial by jury, could have possibly been "lost" during the combining of the cases that did not concern the case in question. Plaintiff Christopher suspects that the defendants involved, Lane and Egly, decided on the "lost during case combining" story in order to have an excuse to deprive plaintiff Christopher of a jury trial in that case, since he had identified in his motion the desire to have jury trials in all open cases at the time.  Then, to cover up that falsification; Ms. Lane and Ms. Egly then had a false document produced to match the request, then changed the record to state that Plaintiff Christopher had asked specifically for a non-jury trial.  Later, C.B. would be given a copy of the court record by someone on the outside who he had given access to his e-file to; and, where it stated that the claimant, C.B., in the same misdemeanor case, had asked SPECIFICALLY for a NON-jury trial, a fabrication and outright falsification of the record by and through defendants Lane and Egly.  In place of a motion that C.B. himself had filed, was a substituted motion, evidently designed by those of the clerk's office, that stated this as fact as well.  The motion on the record of the court was neither designed or submitted by C.B., and this is most obvious, due to the fact that the other motions, filed by C.B. in these cases, looked nothing like this motion that was filed by the defendants; per major differences in its layout, design and wording, or the original motion C.B. had filed concerning the same subject; that showed claimant had asked for a jury trial.  Thus, defendant Egly, in collusion with Ms. Lane and Defendant Hurn and the Polk County Clerk's office; did change the record of the court and substituted C.B.'s motion for their own and showed it to state that it was CB's wish for a non-jury trial, in order to deny the claimant his right to a trial by a jury of his peers; and, in essence, his right to due process. The reason for this fraud by the court will be shown best in and through the following claim items, numbered 88 and 89.

87. On February 29th, 2016, a hearing was held concerning C.B.'s reservation of rights, his declaration of his proper residency, standing and status (C.B. is no longer a dead U.S. Citizen or property of the formed U.S. corporation; he is a living breathing man, and he has, on several occasions, rescinded all signatures with all agencies of Government, NUNC PRO TUNC), and C.B.'s right to represent himself, pro se, while incarcerated, without the absolute need for an attorney. Defendant Kelly, while acting in his official capacity as a judge and employee for the State of Iowa; and using color of law, since he had no authority with which to oversee matters of the plaintiff Christopher; oversaw this proceeding and would blatantly DENY C.B. those rights in this hearing.  Defendants Kelly and Linda Lane (who was acting in her official capacity as an Assistant Polk County attorney and using color of law and authority she had no right to

use) then presented and ruled that, since there was nothing on the record of the court concerning any change of status or residency, that it was evident that C.B. was still who they claimed him to be and living as a U.S. Citizen.  Naturally, since C.B. was never released until well after this time, nothing showing this WOULD or could be filed concerning this fact, until it was too late to do so. Having NO OTHER VIABLE or REASONABLE OPTION, C.B. was then forced to accept the appointment of attorney Lucas Taylor as his stand-by attorney.  Otherwise, materials he would have needed to defend himself, such as his entire cases' files and evidence filed would have never been given to C.B.

88.   On March 3rd, 2016, a "trial" for C.B. was held, and was overseen by Defendant Anastasia Hurn (using color of law and acting in her official capacity as a magistrate and employee of The State of Iowa). Just prior to the recorder being activated, Ms. Hurn was visited by Defendant Price. Upon noting who was in front of Ms. Hurn, he sneered at plaintiff C.B., then turned and walked into chambers. Upon reaching chambers, he was heard by plaintiff C.B. as he said, to Ms. Hurn, "Get him...he's a piece of cake". Then, in the face of all logic and legal reason, defendant Hurn, using color of law, and in her alleged official capacity as a "Magistrate" working for the State; would find C.B. guilty of harassing Darren Tromblay and Jeffrey Pitts, based on no facts or proven basis concerning the charges, made more easily done, since the claimant, Christopher, had been deprived of a jury that he had requested prior.

89.   The timeline of events concerning defendants Pitts and Tromblay, as related by Plaintiff were as follows:  After sending Defendant Tromblay information concerning the cases involving the plaintiff for 2 straight years, Defendant Tromblay sent an email to the plaintiff, that asked C.B. to call him.  On this call, Mr. Tromblay stated that he thought he had enough from the plaintiff to do a story, and stated that he would put his reporter, Jeffrey Pitts on collecting what CityView would need from the plaintiff to get the story out.  It was then that he made it clear to the plaintiff, that if he were to push Tromblay at all about getting the story printed, that he would file charges against the plaintiff.  The plaintiff, C.B. thought this very odd; how normal is it for an editor to contact someone to do a story, then threaten them with criminal charges if they push the editor to print it?  The claimant states that Tromblay knew full well that there was in fact a story here, but was stuck in a bad position, and was also realizing that the claimant was putting and keeping him in that position; and he desired to be rid of C.B. and to never hear from him again. The 'Bad Position', the claimant believes, was this:  In printing such a story, it would affect the lives and careers of many a judge, attorney and elected official; and would seriously damage the afore-mentioned defendants' ability to continue in their criminal actions.  In doing so, also, I'm sure that Tromblay feared that the paper might be driven out of Polk County, or that he himself might lose his job, should he print such a story.  On the other hand, should he not report it, and continue to not report it, he would be accused of having no journalistic integrity; or worse, CityView Magazine might be drummed out of town and labeled an unreliable source of the news, which might also cost him his job/position there, as the Editor in Chief.

90.   After waiting nearly two full months with no word from either defendant Tromblay or Defendant Pitts, C.B. emailed Tromblay to ask when Pitts would be coming to get the story from the plaintiff, since he had not heard from him at all.  Tromblay sent a reply, stating that he would poke Mr. Pitts to ensure that he was on it.  C.B.  did not receive another response from either defendant for 3 or 4 more days; and it was then that C.B. sent the two emails to Tromblay in anger.  Of course, as he had promised, Defendant Tromblay then filed harassment

charges on the plaintiff.  He then testified under oath, and on the stand, that he had never offered to do a story on the plaintiff, that he had only promised that he might look into doing it; then, after reviewing the facts and the evidence (which he had none of; since, as he had testified, Defendant Pitts had not even contacted the claimant at all by this time; so what additional proof, facts or evidence did Tromblay have from the claimant, in addition, that would warrant his decision to not do the story after all?), decided that there was nothing that C.B. had offered him that constituted any kind of a story.  It had been he that, after C.B. had sent him information for 2 years, had asked C.B. to call HIM to get this story going, then offered to send C.B. his reporter (Defendant Pitts); made him wait 2 months for any action to be taken, then when he was contacted, promised action AGAIN, and made C.B. wait some more, and he had, by this time; according to his testimony, decided there was nothing for him to report here?  And what kind of reporter or editor, upon making such a decision, wouldn't call who he had promised to do a story on, and would tell them that they weren't going to do it, if they had decided in that way?  The claimant, Christopher states that the threat concerning these charges, made to the plaintiff on the phone (which was totally uncalled for, and is hardly normal for someone in Tromblay's position to do in this situation) as well as the charges themselves occurred and were filed against C.B., because Mr. Tromblay called and conspired with John Sarcone and his offices to set plaintiff C.B. up to be arrested for harassing defendant Tromblay and would also cause a 5 year no contact order to be issued; to ensure he never heard from C.B. again.  A meeting of the minds occurred here, in that Tromblay, Pitts and Sarcone brought on a situation that would cause the claimant to, first, get angry; by promising him what he desired most, a story done on him; and then leaving him out to dry; and then, since he would of course express that anger at being crossed, Sarcone could then file his charges.  Defendant Pitts had never had even a single communication with C.B. prior to his email received by both that put them in such fear; meaning that defendant Pitts neither knew the claimant or what he was or was not capable of, and, obviously, knew nothing of the claimant's story either.  It's unreasonable for anyone to believe that either of these men were in any kind of fear whatsoever…and, according to just these facts, neither would any judge or magistrate would believe it either.  The point C.B. is trying to make is that there were no threats made to Tromblay and Pitts here, only those made by Tromblay against C.B., and any person sitting in judgement, knowing these facts, would think so as well.  The claimant states that Ms. Hurn was forced by the afore-mentioned criminal defendants and Defendant Price, most of all, to first deprive the defendant of a fair trial by a jury of his peers, and to rule him to be guilty in obvious error, so as to cause C.B. to have more of a history of this type of behavior thereby affect more jail time for him, when they would file more charges against him in future cases. No exhibits are any longer able to be found or accessed by C.B. in this case, nor can they be found to be on the record of the court.  This was a public proceeding. Regardless of statute, it is unconstitutional to not maintain these exhibits on the record, and is a violation of due process, in case of an action that would incur against them, say, in a civil Federal court.

91.   At the end of the "trial" C.B. then verbally filed an appeal to the case, then wrote it out officially and filed it, using the mail service in the jail.  Later, in C.B.'s post-conviction relief case, this appeal would be labeled his "appeal claiming unlawful arrest" (see PCCE080717 and FECR292312), but this is not listed by C.B. to be a reason for the appeal; either on the appeal notice itself, or anywhere else. The appeal was decided by none other than Defendant William A. Price. He of course, held up the conviction by Defendant Hurn, as expected; even going as far as disagreeing with Defendant Hurn concerning the degree of my threats, as "veiled", stating instead that they were most CERTAINLY real threats, meant to frighten Darren and

Jeffrey. C.B. has absolutely no record of any violent crime to date, and, regardless of any threats made to anyone, real or "veiled", has never been accused of or convicted for a violent crime in his life, and has never followed through on even one threat to this date. The point of the matter is, a promise was made, a contract was SIGNED by Mr. Tromblay to do the story, and he hadn't done one, or even spoken with C.B. for 2 full months. C.B. then, had LEGITIMATE purpose with which to contact Mr. Tromblay, and it should have been found as so; but because it involved Defendant Price, and his pet Defendant, Ms. Baker-Hurn, C.B. had been duly denied a jury of his peers by Defendant Egly, and because C.B. had been denied the right to proceed pro se while incarcerated, C.B. was found guilty, and would have been found guilty, regardless, because of Defendant Price and his obvious bias against C.B., and his influence and command of Defendant Hurn, and also because of the same bias, would also be expected to uphold that decision as the non-appellant appellate Defendant. C.B., then, has shown, without a doubt, that a meeting of the minds occurred between the report filer (Darren Tromblay), the county attorney's office (Assistant Polk County attorney Linda Lane, now an Assistant U.S. Attorney, was someone who prosecuted and also presented as the party to the case in EVERY CRIMINAL CASE C.B. INCURRED, from this case until her promotion, three in all, from January until December of 2016, using quite a variety of simple and aggravated misdemeanors and felony charges, over eight in all in a one year period), Defendant Price, Defendant William Kelly, Defendant Egly, Defendant Hurn, to conspire against, withhold and deny the plaintiff each and every civil and due process right available, in just what has been stated so far.

92.   The claimant Christopher now claims damage against defendants Pitts, Tromblay, Kelly, Egly and Hurn:

   a.   Defendant Tromblay did damage plaintiff Christopher in fact, by conspiring to rid himself of plaintiff Christopher, by colluding with John Sarcone's office to eventually file charges on him.  Defendant Tromblay did perjure himself on the stand in relating the events of his interactions with plaintiff Christopher and did engage in libel and slander to get him out of his life for 5 years.  Darren Tromblay is also guilty of breach of contract with plaintiff Christopher.  Plaintiff Christopher is in possession of a signed email that states the terms of the contract clearly.  The plaintiffs ask for relief of pain and suffering and mental anguish at the hands of Tromblay for a period of 2 years.

   b.   As to Jeffrey Pitts, Mr. Pitts also lied on the stand, in order to assist his then boss, and also slandered the character of the claimant, Christopher, causing him to receive jail time and would serve also to further damage C.B.'s formerly spotless record.  The plaintiffs claim damage of pain and suffering and mental anguish at the hands of Jeffrey Pitts, for a period of the same 2 years.

   c.   As to Anastasia Hurn, Claimant Christopher claims damage in fact, that Ms. Hurn conspired with William Price, Darren Tromblay, Jeffrey Pitts and Linda Lane to slander and libel the claimant's good name and cost him 30 days in jail; and, bonus, to affect a 5 year no-contact order for reporter Pitts and Editor Tromblay.  The court asks for 2 years of pain and suffering and mental anguish at the hands of Ms. Hurn.

   d.   As to Defendant Kelly, Defendant Kelly did, acting under color of law, deprive a non-U.S., Constitutionally protected resident of the republic of any and all means C.B. could manage, in order to prove that he was not under Defendant Kelly's jurisdiction in any way, shape or

form.  Defendant Kelly also deprived plaintiff Christopher of his Constitutional right to defend himself without having an attorney, on the record of the court.  Claimant Christopher claims that defendant Kelly conspired with Linda Lane to deprive C.B. of his constitutional and due process rights.  The Claimant C.B. asks the court for 2 years pain and suffering and mental anguish from defendant Kelly.

e.  As to defendant Egly – Ms. Egly did conspire with Linda Lane to deprive claimant Christopher his due process rights, by denying him his right to a jury by his peers; and assisted in forging a court document AND the record of the court to do so and presenting that forged legal document as the claimants; to cover up her actions.  Claimant Christopher claims damage at the hands of Ms. Egly, as she used color of law to invent false jurisdiction and denied the claimant his requested proof of that jurisdiction over him, something she did not have, as an administrative clerk, and sought to exercise power over a resident of the republic.  The claimant seeks pain and suffering at the hands of Ms. Egly, and mental anguish.  The claimant gives his permission to the court to file charges of fraud against Ms. Egly.

93.  Mr. Lucas Taylor was assigned to C.B. on March 3, 2016 by Defendant Kelly, while claiming C.B. agreed to do so (though C.B. obviously had no other option, and was because of this, forced to take Mr. Taylor on to get anything that would help C.B. in his pro se defense) as "stand-by council." An allegedly experienced attorney in felony cases, Mr. Taylor never once mentioned that maybe C.B. should ask for a bond reduction hearing to lower his incredibly high bond (they did finally lower the bond - right after the jury found C.B. guilty, 2 weeks before C.B.'s official sentencing, giving C.B. around a two-week period of freedom before his sentence - to what it should have been, $4000 for the two aggravated misdemeanors.  The felony charge was dropped during jury deliberations.); never once suggested depositions, (probably the most important part of any felony case) did not file an appeal for C.B. in the case that he promised he would for the plaintiff; nor did he poll the jury at C.B.'s request, following their verdict to see if they had been tainted by defendant Des Moines Register's article that libeled and likened C.B. unreasonably and excessively to be a "lawless, possibly murderous domestic terrorist" that had appeared just one day before jury deliberations; to see if maybe a mistrial should be motioned for.  Mr. Taylor would later testify, in the post-conviction relief case some months later, that none of those things had fit into his "defense strategy", a strategy he conveniently never told his client/co-council about, at any time.  Mr. Taylor's "defense strategy" would also include his conveniently not being able to attend a very important hearing where each and every subpoena of every official and employee of any branch or in the service of Government (they would be called as hostile witnesses for the side of the defense by C.B.) was summarily dismissed and quashed by defendant Blink without reasonable or lawful justification; and nearly ALL of C.B.'s evidence, over 200+ exhibits filed in his case, would also be dismissed to be  "irrelevant" to the case.  In the post-conviction case that followed, C.B. would be accused of being the attorney in charge, and claimed that the "limit of reach of the stand-by attorney", filed by C.B., which essentially just ordered that Mr. Taylor not file anything into the case without asking C.B.'s permission to do so; was found to be reason enough for Mr. Taylor to not speak until spoken to, nor do anything else that he would normally do in a charged felony case - per the illogical reasoning of Defendant Jeanne Vaudt.  Finally, it was in Mr. Taylor's "defense strategy" to not file an appeal for C.B., while he was incarcerated during the ENTIRE period of his time to get it filed, after promising C.B. that he would.  Mr. Taylor would later testify in the post-conviction hearing, for the other side's defense; and AGAINST HIS CLIENT, that he didn't remember if C.B. had asked him to file an

appeal for him or not.  It wasn't until the exact date of his release (after the 60 day deadline, conveniently,) that C.B. found that Mr. Taylor had not filed it; and by that time, the time to file it had lapsed.  Defendant Jeanne Vaudt, (an actor and employee in her alleged official capacity as a judge working for the State of Iowa) in the post-conviction case to follow, would rule that it had been C.B.'s responsibility to file his own appeal, since C.B., at sentencing, had once again chosen to take the reigns as the lead attorney in his case, and Mr. Taylor had again been set back to stand-by status.

94.   On March 16th, 2016, Defendant Blink, using color of law in his alleged official capacity as a judge of the State of Iowa; held a hearing to discuss the subpoenas that C.B. had been asking to have served at state expense. Mr. Taylor, as usual, was not able to attend.  At this hearing, Defendant Blink would mention that C.B. had once again been questioning the court's jurisdiction over him; and then stated that, unless C.B. gave the court it's jurisdiction, that Defendant Blink would not be able to enforce the subpoenas be served at state expense as lawful and needing to be heeded.  C.B. then grudgingly granted defendant Blink his jurisdiction, without question. What Defendant Blink failed to mention to C.B., was that it was his intent a few days later, just before trial, to dismiss and quash the subpoenas of nearly every important witness C.B. had called for his defense that was in any official capacity, then planned to have Mr. Taylor dismiss those remaining intended to be character witnesses for the Plaintiff.

95.   On April 8th, 2017, that hearing was held before Defendant Blink, 2 business days before trial (the Thursday before the Monday trial).  Lucas Taylor was once again, and rather conveniently as well; "unable to attend."  The hearing was to hear opposition to the claimant's subpoenas, which had been served around the end of March, 2017, to discuss evidence filed by C.B. during the course of the time before trial; and to discuss Defendant Lane's 'motion in limine" This motion had been filed in the case on April 7th, 2016, just a day prior to the hearing; and plaintiff Christopher was neither notified or given copy; and didn't know about this hearing until he was brought to attend it.  Concerning item 4 of the motion, C.B., who had discarded his name, a legal fiction, used his unalienable right to simply change what he is called, requested Mr. Blink to order C.B. not to use or be addressed by this alternate name.  Ms. Lane was asking that C.B. not use that name, not because she didn't want to confuse the jury, as she claimed, but so that the reason for this choice of name wouldn't be disclosed, and possibly lead to other matters and testimony Ms. Lane had tried very hard to disclude; in obvious protection of all that had been and were currently involved in matters concerning this plaintiff. It also stated that C.B. had not filed anything, or provided any legal documentation showing that he is able to be identified as this person. This had been due, primarily, to the fact that C.B. had been incarcerated since his arrest. She goes on to state that the name the courts and Ms. Lane are using is the name the plaintiff was being charged with, not the alternate name the plaintiff's true name.  In item 5 of the same motion, it requests that the claimant not mention or describe events or ask witnesses to give testimony concerning C.B.'s juvenile cases, in particular, JVJV237203.  She states the reason for this is that this testimony or evidence is not relevant to the matter at hand (the case itself), and also because "its probative value is substantially outweighed by the potential to cause prejudice, waste of time, confusion, or to mislead the jury."  She was right, of course; it WOULD have caused prejudice, and would have served to mislead the jury….right to the defendants afore-mentioned to this point, being the cause of this action against C.B. and against her, the court, and those that had conspired by filing these false charges.  This is not requested for these reasons, it was requested because

they wanted nothing that had happened in those cases to come to the fore, nor did they want the true reason for the action at present to come to light, the more than apparent involvement of the D.C.F.S. in Los Angeles.  Defendant Blink then dismissed nearly 190 or so pieces of evidence that had been filed by C.B. in his defense, nearly all of his evidence, showing that this case had been implemented against him; not because he had committed any real crime, but because of those who had conspired against his rights; a defense that C.B. had planned to bring in this trial. Then, Defendant Blink addressed motions to quash subpoenas, and dismissed nearly 28 witnesses, all who were elected officials and people in positions of civil duty.  Then, to be sure of obliterating the defense of C.B., he then dismissed subpoenas of those that were not even present in the courtroom, nor were their attorneys present.  Later, Mr. Taylor would testify (in the post-conviction relief case), that he had informed the remainder of C.B.'s 11 witnesses, all called to uphold the character of C.B., to not come in, that they would not be needed to testify; without informing the claimant, C.B., of this.  He also later testified in the upcoming PCR case to come that these witnesses testimonies weren't needed, because it wasn't part of Taylor's "defense strategy." These actions by the afore-mentioned destroyed the defense of C.B., just two business days before trial including two weekend days; and offered C.B.  no chance to recover his defense or plan a new one.

96.   On April 11th, the trial began, and would continue for 3 days. The first day, (while the prosecution was presenting their case) all of C.B.'s 11 remaining witnesses that C.B. had summoned appeared to testify on C.B.'s behalf.  The next day, they all came again, but the prosecution had still not rested. This would be the day that they were told by Defendant Taylor that they would not be needed and need not return. The following day, Wednesday April 13th, 2016, was the presentation for the defense. C.B.'s entire strategy had been destroyed, and the remaining witnesses had not showed up again to testify; and due to the lack of evidence left to present in his defense; C.B., then, had no choice but to rest. Also on the first day; a reporter that covered court cases for defendant The Des Moines Register (U.S.A. Today), Iowa's main newspaper; Mr. Grant Rogers; showed up to gather facts, and witness the first hours of the trial. He stayed until around an hour of the prosecution's case, left, and did not return. Later, following the issuance of the resulting 2-page story, several quotes were given Mr. Rogers concerning C.B. and this case. Those included ONLY statements and facts that would be related to them by defendant John P. Sarcone; the alleged "Victim", Ms. Jeanne Munson; and a member of the FBI; and no facts or statements that were of the defense or their co-representation.  No facts related to Defendant 'The Des Moines Register' were checked or validated, no "other side of the story" was gotten from either C.B. or his "stand-by attorney." Mr. Rogers did not stick around to hear or see anything that happened on the side of C.B's defense.  This article was printed the next day, and easily left anyone reading it to believe that C.B. was a damaged, mentally ill criminal, and likened the claimant to a 'possibly murderous, possibly cop-killing, lawless domestic terrorist." It was so damaging, the landlord of his trailer court in Carroll, Iowa would then would ask C.B. to move out and not return. The day following his conviction, the claimant would ask Attorney Taylor to poll the jury, to get a feel for whether a mistrial might be needed due to their viewing of this article (as it would be obvious to any living breathing attorney that it might be necessary).  Mr. Taylor promised that he would do that, then did not. He would also testify at the post-conviction relief case that this was something he didn't feel would work, in his experience, so he didn't follow through with the poll – but chose to also not inform his client/co-council of this rather important self-decided decision that only served to harm C.B. further.  When it was mentioned by plaintiff C.B. to Defendant Blink that the jury might have been swayed by this article, Defendant Blink would

state, simply, that the jury had been admonished at the beginning of trial not to "pay attention to the media" concerning the case or C.B.. and that this threat was, obviously, all that had to happen, in order to absolutely ensure that they did NOT pay attention to the media.

97.   On April 16th, 2016, C.B. was found to be "Guilty" of the two aggravated misdemeanors of Stalking and Harassment in the first degree, a verdict given by a jury obviously tainted by the Register's libelous article, and who would also be efficiently deprived of any and all information they would need that would show the conspirator's actions against C.B. that caused C.B. to even be before the jury in the first place; let alone what might have caused his current situation; such as emails being sent out to 8000 DCFS social workers in Los Angeles that they didn't like.  They certainly would not ever know these facts, thanks to the dismissal of all witnesses and evidence that would have shown other reasons for C.B.'s desperate words as spoken to Mrs. Munson and Mr. Worthington; and were also deprived of their right to hear defense witnesses that would have shown C.B.'s normal character and demeanor, such that it would have easily shown that C.B. was never someone who would, under normal circumstances, ever make threats like this unless he was backed into a corner with no way out of it.  Threats, a felony, was eventually dismissed by Defendant Blink, due to the language used in the statute, which wrongly stated C.B. did threaten the use of an explosive or incendiary "device." C.B. was innocent of violating this statute, because he did not do what it implied. Defendant Blink would wrongly praise Mr. Taylor for "getting the charge dismissed" at sentencing, but C.B. knows and would state that the only reason it did get dropped is because the jury didn't understand the language of the charge in relation to what C.B. was accused of; and had been deadlocked on that verdict alone for quite some time. C.B. did NOT threaten the use of any kind of a device, and all knew that. Certain conspirators named in this action colluded with and instructed Defendant Alyssa Wilson (who was acting using color of law, in her alleged official position as an employee of the City Department of the Altoona Police Department) to file a report for this charge on the day claimant C.B. was on his way to jail in Polk County, then John P. Sarcone would approve this charge within an hour's time, because they desperately needed a bigger and additional charge in place; not only to be able to charge higher bail and bond, therefore depriving C.B. of his freedom absolutely, pre-trial; also as a charge they knew might confuse the jury, allowing them a better chance to convict C.B. of a felony charge and hold him in jail or prison longer.  This was the real cause of the jury's deadlock, not anything that Mr. Taylor had done, which was little to nothing unless it proved detrimental to C.B.'s defense. A deal was offered C.B. that had dropped this charge much earlier, which proved to C.B. that the prosecution was sure that the charge probably wouldn't stick. Polk County often offered to 'deal' out those charges they think they can't win out on. The claimants believe strongly that this behavior engaged in by these collateral conspirators includes jury programming as well as tampering by use of the avenue of the media, for example, and more; and depriving defendants of everything they need to win, such as by dismissing important evidence as 'irrelevant' and witnesses of important caliber for the defense just prior to trial.  Each witness would 'testify' in their affidavits and motions to quash, consistently, and almost using the exact same language in each motion, that none of them had knowledge of plaintiff Christopher, or concerning the facts of the case before them; and each and every one would claim to be victims of my wont to harass them (because of C.B calling them unnecessarily as witnesses) and would claim it was overly burdensome for each one of them to have to testify; even when C.B. might only need them for all of 5 minutes, or possibly...less. C.B. claims that these witnesses knew full well of him, and all actions taken against him...mainly because C.B. engages in measures to ensure they don't forget what

they've done. After the verdict came back, Defendant Blink then lowered the defendant's bond to what it should have been at the very beginning, for only the remaining two charges, the two aggravated misdemeanors, to $4,000, and allowed the defendant to bail out for the two weeks prior to his sentencing, for $400. The claimant opted to do so and went home.

98.  Sentencing commenced May 4th, 2016. Presented by defendant Lane to Defendant Blink at this hearing were recordings of phone calls made by C.B. to his wife, and to others during the entire time at varying points of C.B.'s incarceration.  During the course of C.B.'s incarceration, the phone company that had provided him the ability to make calls, in approximately the 2nd month of his period of incarceration time; began relating to him his rights and stated that anything C.B. said in these calls might be used against him in a court of law, as if these calls were, in essence, interrogations.  C.B., from this point forward, was unconstitutionally deprived his right to free, private or confidential communications (free speech), and his ability to relate or discuss anything concerning his case privately. Mail, both out and in, was read, and checked for possible contraband and incriminating statements. Anything that was typed to anyone was thrown away. The majority of phone calls made to C.B.'s wife, his "Stand-by attorney" and others were privilege, both marital and attorney-client, and could have also been construed as "work-product privilege", because of the claimant's status as "Pro Se Litigant." When this objection to the phone calls was made to the Defendant Blink, he would state that C.B. was given appropriate warnings of this with each call he made from jail, and was, essentially, consenting to speak regardless of those warnings (the only alternative to this, of course, was not speaking to anyone at all, ever) and anything said could be used against me and was. During the course of the sentencing hearing,  defendant Blink threatened my friend, Brent Swallers, unlawfully, with criminal charges of harassment.  Swallers, who had written both Linda Lane and Defendant Blink on my behalf, and had been ridiculously polite in his communications with both of these defendants.  Mr. Swaller's purpose for his contact of these defendants had been to find an alternative to jailing C.B. and offered to pay for C.B.'s debt in damage immediately to avoid the same; should someone claim damage of this crime in fact (which no one would, of course), and present him or C.B. with a bill for damages.  This threat against Mr. Swallers was somehow not included in the transcripts of the sentencing, once again proving these defendants guilty of continuous instances of fraud and fraud upon the court and total disregard of its record; in that, by falsifying and tweaking the record and transcripts, it affects the purpose of putting these criminals and their actions in a more favorable light, in a case of appeal or accountability for the same.  In this manner, they can also "control the narrative" of every proceeding, provide or delete statements made as well as the actions taken or spoken, and by who; without consequence.

99.  C.B. was sentenced to a year, suspended, with an incarceration of 60 more days to be served for each of the two aggravated misdemeanors, to be run concurrently with the time he had and was about to serve. Because they couldn't really do anything more serious than this for just two aggravated misdemeanors, C.B. was then told that he would, upon his release, report for probation for a period of two years.  NOTE:  At no time was C.B. told, by anyone, where to go after his release, or how to get signed up for probation. C.B., prior to his release, had to ask other inmates how to do all of this. The first violation of this probation, by the way, was to be 90 days, per Defendant Blink, and would increase exponentially with each subsequent violation.  It was then the notion that probation was exactly what those defendants wanted for C.B., came to mind.  Anytime they didn't care for what he was doing, they could violate him and put him back in jail for longer...and longer. Also, as a condition to probation, Linda Lane

had mentioned limiting C.B. in his internet use, another perk for them, and a clear attempt to violate plaintiff C.B.'s unalienable right to free speech by defendant Lane. Later, when and if probation ever would have neared its end, the claimant is positive that the defendants would have fabricated or created a situation that would find reason to claim C.B. to be in need of a probation extension for an additional year or more, as they often do in Polk County.

100.  During the course of his incarceration, C.B. noticed that his release date did not match the date of release, stated by Defendant Blink. C.B. immediately sent a letter to Defendant Blink, asking for a reconsideration of sentence, because the release date was for nearly 2 months later than his release date, doubling his sentence.

101.  On June 1st, 2016, a hearing was held for the reconsideration of the claimant's sentence. The release date was then hastily corrected by Defendant Blink ("Oops! They must have gone consecutive instead of concurrent. My bad!")  Presented by C.B. at this hearing were also 4 full sheets of harassing comments made on C.B.'s online blog and on Facebook.  Some were out and out marked with the name of the State's 2nd primary witness, Mark Worthington; others, more threatening, were done using a fake profile with another false name. The state had, during sentencing, asked for an order of protection to be issued against plaintiff Christopher concerning this witness; but, since C.B. had presented this evidence, and would have forced Defendant Blink order this court-protected and conspired with witness be arrested for the same crimes being alleged against plaintiff Christopher; and therefore, to protect him, would not order protection for Mark Worthington; since that order of protection would have to be enforced both ways, and would affect the arrest of Mr. Worthington immediately.  C.B. had smartly asked a question to defendant Blink concerning that very fact BEFORE he presented evidence of these harassing comments; and just after the request for this order of protection was made by defendant Lane.  That harassment by Mr. Worthington of the plaintiffs, by the way, continues to this very day, with zero threat to the continued and obviously assured liberty of conspirator/contrived witness Mr. Worthington.

102.  After C.B.'s release, he went, the following morning, to the Polk County courthouse to sign up for his probation. Upon entering the courthouse, and going to the proper room, C.B. was immediately asked for $300 to sign up for this, and was told that, if he didn't have it then, he was to pay it soon. He then spoke to someone about signing up, and during this sign up, decided against doing probation (they had wanted him to sign away his right against illegal searches and seizures). C.B. was also told that they didn't have probation where he lived, and that he would have to go to Ames, nearly 60 miles from where C.B. lived (which was impossible for C.B., since C.B. had no vehicle.) C.B. then told the man doing the sign-up that he didn't want probation after all, and told him that C.B. would speak to defendants Blink and Lane about this, and did not complete his application.  C.B. then immediately submitted a letter to Defendant Blink on the record of the court on July 11th, 2016, asking Blink for another reconsideration hearing date; where C.B. would ask to be revoked from probation and do the remainder of his sentence. In the letter, C.B. also asked Defendant Blink for a little time to make sure all of C.B.'s affairs were in order, and stated that the claimants were moving back to Des Moines, Iowa, because C.B. wanted his wife, claimant Elizabeth, to be closer than 84 miles away for visits (and, because the claimants had been ordered to move out of their home in Carroll, Iowa due to the libel in the Defendant Des Moines Register's article, afore-mentioned). Defendant Blink then set the hearing date to hear this motion for August 18th, 2016, almost a month and a half later. Meanwhile, just after the claimants moved from Carroll to Des Moines,

a letter was mailed to C.B. to his now former home in Carroll, Iowa, allegedly, from the Ames probation office, setting an appointment for C.B. to meet with his new probation officer; which of course, C.B. would never receive.

103. On July 24th, 2016, a document was filed in the case, from the Ames Probation office (the same that had sent C.B. the appointment letter), stating to Defendant Blink that C.B. had not shown up for the appointment they had set up for him; and asking Defendant Blink to violate C.B.'s probation terms, and issue a warrant for his arrest for probation violation.  As C.B. also received notifications in his case in email, he noticed this, and immediately wrote another letter to the Defendant, and filed it on the record, stating that there was already a hearing date set to hear the matter of my voluntary revocation, in place; and to please not issue a warrant for his arrest or find him in violation of probation that C.B. had never completely assented to or applied for.  On July 25th, 2016, Defendant Blink issued the warrant anyway. C.B. also somehow never received a notification of this warrant being issued.

104. Also on July 25th, more than likely after he saw this warrant issued, knowing that it was wrong of Defendant Blink to issue it; and, more than likely, because he had witnessed enough wrong committed against C.B. by this time; Defendant Lucas Taylor motioned defendant Blink and the court to withdraw from C.B.'s case and service. The next day, on July 26th, 2016, Defendant Blink would file to deny Taylor his withdrawal.

105. The claimant Christopher now states damage in fact against defendants Blink and the Des Moines Register, operating under the incorporation of U.S.A. Today:

   a.  That Defendant Blink did conspire with John P. Sarcone, Linda Lane, Lucas Taylor, Jeanne Munson, D.C.F.S. in Los Angeles, California, and DHS in Carroll Iowa, as well as Defendant Alyssa Wilson, Mark Worthington (witness) in order to bring fabricated charges against plaintiff Christopher, because Los Angeles D.C.F.S. didn't care for plaintiff Christopher putting their employees' business out on the internet, and didn't like that plaintiff Christopher interfered in the aforementioned instance in Carroll, Iowa.  Defendant Blink used color of law to completely destroy plaintiff C.B.'s entire defense 2 business days before trial, by callously dismissing all of C.B.'s witnesses for the defense, and all of Christopher's filed evidence as well, hours before trial, blatantly depriving him of due process of law; and not only caused plaintiff Christopher to lose and lose a year of his life in jail, but also threatened him with excessive continued jailings in the manner of 'probation violations;" and wasted no time getting the ball rolling either, in that neither he, Ms. Lane nor Mr. Taylor would tell Christopher how to even get going on probation.  Had plaintiff Christopher not found out for himself how to get on probation or hadn't asked to be revoked from it and finish his time in jail, plaintiff Christopher would probably still be in jail, "violating his probational terms."  Mr. Blink did uphold and enforce a massively increased and highly unconstitutional bail and bond against C.B.; and didn't allow it to be lowered until sentencing to what it should have been at the start; without cause.  Mr. Blink did unnecessarily issue a warrant for the plaintiff's arrest with NO LAWFUL CAUSE or LEGAL REASON to do so; unnecessarily depriving plaintiff Bruce of his Constitutionally protected rights to life and liberty.  Mr. Blink did deny the plaintiff all confidentiality rights while he was incarcerated, concerning his case, used what should have been C.B.'s private and privileged calls against him in court, and threatened someone that was trying to help plaintiff Christopher with criminal charges for politely asking Blink and Ms. Lane if there was

a better way than jail to handle plaintiff Christopher's case.  Defendant Blink also purposefully attempted to double C.B.'s sentence, libeled and slandered him on the record of the court, influenced the jury just before sentencing by allowing the jury to be swayed by the Des Moines' libelous article; by denying the occurrence of a mistrial.  Plaintiff Christopher, the living man would ask this court for excessive pain and suffering and mental anguish relief for the crimes committed against Plaintiff Christopher by defendant Blink, and grants the court leniency in filing charges against Mr. Blink for fraud, and deprivation of Christopher's unalienable, Constitutionally provisioned civil and due process rights, as well as for conspiracy against the same.

b.  As to damage in fact caused by the Defendant The Des Moines Register, acting under the incorporation of U.S.A. Today, the claimant, Christopher, brings that reporter Grant Rogers, working in his capacity as a reporter working for the Register, did not fact check, did not come to the other side for the other side of the story involving defendant Munson; and in so not doing, did, the next day, commit the crime of libel; in that The Des Moines Register did conspire with John P. Sarcone, Ms. Lane, Defendant Munson, and an employee of the FBI to feed false and unproven facts about the claimant, calling him a "sovereign citizen", something the claimant has never once stated himself to be; a faction of loosely spread out American Citizen that were then further alluded by an FBI source to be "possibly murderous, lawless, and probable domestic terrorists"; in the subsequent article they printed the next day concerning the case of the claimant, FECR292312; and in their combined and collective efforts they colluded to print libel against plaintiff Christopher in order to better affect a jury verdict of Guilty by the jury the day following its issue.  This article also caused both Claimants to lose their rented home in Carroll, Iowa, because of its influence on their landlords, and caused them to have to flee the city.  The claimants ask for an underminable amount of pain, suffering and mental anguish at the hands of this Newspaper, and ask that charges of libel and defamation be brought against this defendant; since this article is still able to be found everywhere online, and is still being used to defame the character of plaintiff Christopher to this day.

106. On August 16th, just two days before the reconsideration hearing for C.B.'s voluntary revocation, C.B. was sitting outside of a building on 15th and Grand on a blanket with his dog in protest of the property of Defending party Newbury Living, Inc., and their actions against a veteran friend of the plaintiff's, whose only crime it was to allow plaintiff C.B. to stay with him for a short while until C.B. went back to jail.  C.B. had attempted to contact the offices of Newberry Living that were located near the building; to talk to them about the situation, to no avail.  Defendant Nancy Elscott resided in the same building.  Elscott was under the unwarranted impression that C.B. had been the cause of a breakup between another friend of C.B.'s and her some months prior, and when she noticed that Plaintiff Christopher was staying on the property with his small harmless little dog, she harassed the front office of Newbury Living to have him put out.  Not once did plaintiff Christopher ever speak to Ms. Elscott, nor did he ever run into her the entire time he was in the building, so these actions against C.B. and his dog were completely unwarranted.  Richard, the plaintiff's friend, received his first eviction warning within the first 2 weeks the plaintiff was staying there, and Newbury Living's policy was that someone could stay with a tenant as long as 14 days without any issues; but Newbury living harassed and threatened C.B.'s friend anyway, because, more than likely Ms. Elscott wouldn't leave the matter be; and also because it involved a dog, and they wanted $600 deposit for a dog on their property.  C.B. asked if that rule applied to someone only

staying for 14 days or less, and they said yes; though the plaintiff imagines it was said only to make it difficult for C.B. to comply with.

107. On the date of August 16th, 2016, C.B. vacated the premises to save his friend from eviction but opted to protest against Newbury Living for all they had done unfairly to his friend Richard, by sitting outside their building with his dog, and telling people who might want to know why, were they to ask.  Plaintiff Christopher was NOT obstructing the walkway, and there were no "No Loitering" signs posted at or around the property.  C.B. was NOT bothering anyone, and just sat still with his dog, beginning at 6 a.m.  At 8 a.m., 2 officers of the Des Moines Police Department came to the property to investigate a theft.  These officers did not speak to the plaintiff at all.  Around 10 a.m., a K-9 unit pulled up beside plaintiff Christopher, and asked if he was O.K.  Someone, more than likely Mrs. Elscott, had called in saying someone was passed out or sick, and was lying down on the sidewalk or something.  C.B. replied that he was fine, then asked the officer if he was breaking any laws that he knew of.  The officer said "Nope!" and drove away.

108. Around 11 a.m. or so, an ambulance pulled up to the building.  As C.B. sat there, he noticed defendant Elscott with her face pressed up against her apartment window, and he shouted out that she was a nosy bitch and should butt out of other people's business.

109. Around 30 minutes later, the plaintiff noted the management women of Newbury Living were walking over to the building.  Then, a few minutes later, they exited said building and with them was Nancy Elscott.  Then, after another few minutes, they all came back out of the offices and went back to Nancy's building together, then the management women went back to their offices.  Plaintiff Christopher said nothing to any of them, just smiled and sat still.

110. A few minutes after that, Kyle Thies, acting under color of law in his alleged official capacity as a City of Des Moines Police Officer and riding a bicycle, rode up on the Plaintiff, and asked him what he was doing there.  Plaintiff Christopher presented Mr. Thies with his version of the story, truthfully, and Mr. Thies told him he had to pick up his things and move away from the building.  Plaintiff Christopher then simply asked what law he was breaking by sitting on the sidewalk, and not obstructing it; and Mr. Thies then said "You're Trespassing."  Plaintiff Christopher asked how he could be trespassing, since he wasn't even on Newbury Living's property, he was on a public sidewalk and not blocking it in any way; and Mr. Thies replied "O.K, then you're loitering."  Plaintiff Christopher asked Mr. Thies to show him the "No Loitering" signs and where they were posted on or around the property, and Mr. Thies stated that "There doesn't need to be any 'No Loitering' signs posted for you to be loitering."  Plaintiff Christopher stated that this was ridiculous, and asked Mr. Thies to state a code of real statute that described how Plaintiff Christopher was breaking a law, and Mr. Thies got on his radio and asked the dispatcher to send the Animal Rescue League unit to come down to where he was and pick up the plaintiff's dog without any just cause or reason.  Plaintiff Christopher then got angry at Mr. Thies and told him that he had no authority to pick up the plaintiff's dog, since he had made no arrest of the plaintiff; and C.B. then called 911 on his own cell phone in an attempt to report the unlawful actions of Mr. Thies; and asked for a supervisor to come to the scene.  The plaintiff informed the operator that he was breaking no laws, and that Mr. Thies was using color of law to deprive the plaintiff of his right to "peacefully assemble" in protest, by and through the act of harassing the plaintiff without cause until he left the vicinity of the property of Newbury Living to their satisfaction.  Halfway through his complaint to the

911 operator, the plaintiff noted that Mr. Thies was speaking quietly to the dispatcher at the same time; then the dispatcher hung up on C.B. in the middle of C.B. asking for a supervisor. Thies then used color of law and violated the plaintiff's civil rights to be wherever he chose to be, and told C.B. that if he did not move, that he would be arrested for no crime committed. The plaintiff, who did not want his dog to go to the ARL without cause, picked up his stuff and walked away, and walked east half of a block and turned left to vacate the area, and got about another half a block, then looked over to his left, where he saw the entire staff of the Newbury living offices at street level, and looked up to see Nancy Elscott out on the fire escape, on the 2nd floor.  They all followed C.B. along as he was walking away, for no real reason the plaintiff could think of, until after his arrest.  Plaintiff Christopher then flipped them all off and stated that he would be back

111.  After this, Mr. Thies once again rode up behind the plaintiff C.B. on his bicycle, and said "You're under arrest"  The plaintiff asked him what for, and Mr. Theis stated that he had been riding away from the plaintiff; minding his own business, and had got almost 2 blocks down the street, when he allegedly had distinctly heard Plaintiff Christopher curse at the staff of Newbury Living and Nancy Elscott, even though he was supposedly riding against traffic downtown, and plaintiff had yelled in the direction opposite the direction of defendant Thies, then had allegedly noticed that the all the kids that were there in a park half a block away had also heard the plaintiff do this as well, (at the time of the downtown lunch rush, on one of the busiest corners for traffic in the entire downtown area, across the street from a very loud construction area, with his back facing away from defendant Thies and the park) and they had all stopped to look and see what was happening.  This of course, was a massive lie, and the situation had been conjured up to happen, which was why the management team and Mrs. Elscott had previously been seen going back and forth between Ms. Elscott's apartment building and the Newbury Living office, and also served to explain why the entire office team and Ms. Elscott had been seen by the plaintiff as they followed along with him in unison on two different levels of the building as he walked away from the property.  Plaintiff C.B. had not violated any codes that Defendant Thies had personally witnessed prior to this time, and therefore could not arrest C.B. for doing what he was doing, sitting on a sidewalk on a blanket in front of Newbury Living; so he met with Defendants Elscott and the staff of Newbury Living prior to this incident, and conspired with them and Nancy Elscott to entrap the plaintiff by first getting him angry; then baiting him with the view of his target anger in order to incite C.B. to violate some city statute, such as the Disorderly Conduct code he was charged with, along with 2 other simple misdemeanors which were later charged as 'Calling 911 With no emergency" (because the plaintiff called in to 911 to complain of the obvious harassment of the plaintiff by defendants Thies, but that involved a police officer, not a civilian, so is evidently legal because it's a crime performed by an officer of the law) and Harassment by the plaintiff of defendant Thies.

112.  Defendant Thies had also called in to enlist the help of officer Cole to assist in C.B.'s arrest, since Cole was working nearby at the area of construction across the street.  Defendant Thies placed C.B. in handcuffs, sat him forcefully on the ground, and awaited a police van to transport plaintiff C.B. to the Polk County Jail.  As they waited, Plaintiff C.B. noticed that his wife, Plaintiff Elizabeth, was walking towards them.  Plaintiff C.B. then shouted out to plaintiff Elizabeth and told her to hurry down to him to get their dog away from the area, and Mr. Theis, and that the ARL was coming to take him.  Defendant Thies then acted with color of law against the civil rights of plaintiff Elizabeth in that he then threatened her with arrest, if she picked up the dog.  Then

Officer Thies asked C.B. for his name, and C.B. refused to tell him; stating that Mr. Thies had set him up to be arrested for nothing, had threatened to remove the plaintiff's dog without lawful cause, and had threatened the plaintiff's wife, E.B., also without lawful cause and using color of law against the rights of both plaintiffs.  Then Mr. Thies turned towards plaintiff Elizabeth, who had been meanwhile picking up plaintiff C.B.'s things to take home with her, and forcefully grabbed C.B.'s laptop bag from her hands, and began going through it, and stated "I'll find something in here that has your name on it!."  He found a legal document pertaining to the case that Plaintiff Christopher had just endured and called in C.B.'s unlawfully stated name on the document to run it with the dispatcher.  Upon receiving his answer, Mr. Thies then shouted out, loudly, "Oh, so there's a warrant out for your arrest for harassment and stalking!"  The warrant was for a probation violation, the warrant that the court had not notified C.B. of and that C.B. didn't know had been issued.  This situation had evidently warranted the claim that C.B. had harassed Mr. Thies, because he wouldn't provide Mr. Thies with his name, and Theis brought this charge using his reasoning that, because C.B. KNEW that there was a warrant for his arrest, and, because he knew this, wouldn't provide Thies C.B.'s name, he was allegedly guilty of harassing defendant Thies in and through obstructing Mr. Thies while in the performance of his alleged "official duties".

113.   On the date of 8/17/2018, Plaintiff Christopher appeared once again before defendant William Price, the day after his arrest.  Defendant Price placed an unreasonably high cash bail on Christopher for these three simple misdemeanors, in the cash only amount of $1500 per charge, for a total of $4,500.  Defendant Price once again used color of law, was acting as the appearance Judge in his alleged official capacity as an officer of the Court in the employ of the State of Iowa.  Defendant Linda Lane, again acting under color of law was once again in charge for the prosecution of the case. All charges were offered to be dropped IMMEDIATELY against C.B., by Defendant Lane, but C.B. felt that the matter should be presented before a jury, because he felt that the arrest and the charges that resulted were ridiculous and unlawful, and asked for a jury trial. This trial was to be held on September 16, 2016, in front of State Actor "Judge" Hanson, and the defendant was found to be guilty of two charges by a jury; and a third, for harassment of a peace officer, was dropped. the sentence was already in effect and was made to run concurrent with that sentence plaintiff Christopher was already serving. This trial and what happened in it is quite important, in that, no reasonable person hearing what happened would find C.B. guilty; but thanks to proper programming by defendants Lane and Hanson; added to jury stacking, they found C.B. as guilty, regardless.

114.   The plaintiff, Christopher now states damage in fact against these defendants:

a.   Concerning Defendant Linda Lane, the claimants state damage in fact did occur, in that, first and foremost, Ms. Lane, acting in color of law, for no discernable reason, was in the position of prosecution for the State of Iowa in each criminal case brought against Plaintiff Christopher.  Plaintiff Christopher doesn't even wish to venture a guess as to why this happened but was convinced it might have had something to do with her eventual promotion to the position of Assistant U.S. Attorney.  Defendant Lane did, in all actions, seek to deprive plaintiff Christopher of his due process, civil, and constitutionally protected rights.  She is also guilty of conspiring against plaintiff Christopher's rights with Defendants Sarcone, Blink, Kelly, Egly, Hurn, Taylor, Munson, The Des Moines Register, Elscott, Tromblay, Pitts, by and through witness and jury tampering, jury stacking, libel and slander, filing false charges, malicious prosecution, fraud and falsification of records and changing

55

the record of the court.  Ms. Lane engaged in witness tampering though coaching of Ms. Munson and Ms. Elscott, Kyle Thies and Witnesses Mark Worthington, and others on what to say on the stand, and by telling defendant Munson what to say in her victim impact statement.  Ms. Lane engaged in fraud and falsifying the record of the court and legal documents when she found a way to skirt the defendant's motion to have a jury trial in the matter of the alleged harassment of Defendants Tromblay and Pitts, by conveniently losing that request in the process of combining 2 case numbers for Plaintiff Christopher's cases that were active at the time; FECR292312 and AGCR292141.  Defendant Lane did also conspire with defendant William Kelly to deprive plaintiff Christopher of his lawful right to defend himself without an attorney and deprived plaintiff of his right to prove his status as a non-U.S. Citizen.  Ms. Lane did also conspire with Defendants Blink and Taylor to affect a guilty plea and deprive the plaintiff of his rights to both a mistrial and an appeal.  Ms. Lane did also conspire with the defendants John P. Sarcone and the Des Moines Register to feed a libel-filled story for reporter Grant Rogers to report and print, in the defendant's attempt to sway the jury to find plaintiff Christopher as guilty of the crimes for which he was accused. The claimants state that Ms. Lane did cause damage in fact, in that she was guilty of conspiring against the civil, due process, Constitutional and unalienable rights of the claimant, Christopher, and did cause a full year of mental anguish and pain and suffering to BOTH claimants, in that she conspired to deprive plaintiff Christopher of his right to life and liberty, and thereby causing plaintiff Elizabeth undue mental anguish and pain and suffering in so doing, for a period of a year.  Ms. Lane engaged in this conspiracy with Defendants Tromblay, Pitts and Hurn; Defendants Egly, Kelly and Sarcone; Defendants Munson, Elscott and Thies, and Wison, Blink and Taylor, in that she abused her position, using color of law, to affect prosecution of false charges in every single criminal case brought against plaintiff Christopher from January 21st, 2016 until his last case which ended in September of 2016. Ms. Lane did also conspire with Defendant John P. Sarcone to flee from Des Moines and from having to defend her criminal actions, laid out and brought against her in case PCCE080717 by Plaintiff Christopher, in Plaintiff Christopher's Post Conviction case, where Ms. Lane would have had to present as a primary witness, in that she was acting in her role, using color of law, as the acting Assistant Polk County Attorney in the process of acting as an injured party, allegedly representing the entire State of Iowa as the Damaged party, yet would not submit her damages to any court, nor would she come forth and swear to be damaged, and how.  The claimants ask the court for pain, suffering and mental anguish for BOTH claimants Christopher and Elizabeth for 2 years, and ask this court to file charges of damage by Mrs. Lane for libel, slander, malicious prosecution and for conspiring to libel and slander the claimant Christopher with the reporter of the Des Moines Register in order to better affect a guilty verdict in FECR292312 by falsely and unlawfully influencing the jury and State's witnesses.

b.   Pertaining to Defendant Elscott, the claimants state claim in damage in that Ms. Elscott did libel and slander C.B., both initially to get charges filed, and later as she perjured herself on the stand and under oath, by offering false testimony to the jury in the trial for case #SMAC363417.  Ms. Elscott did cause plaintiff Christopher to have additional charges placed on his record, and so plaintiff Christopher asks for relief in the form of 2 years of pain and suffering and mental anguish.

c.   Pertaining to Defendant Thies, the claimant Christopher states that Mr. Thies did use color of law in his alleged official city paid capacity as a Des Moines Peace officer to criminally

harass plaintiffs Christopher and Elizabeth, and falsely arrest plaintiff Christopher against his unalienable and Constitutionally protected rights to free speech and to assemble peacefully in protest, without reasonable or lawful cause.  Defendant Thies is also guilty of conspiring with defendants Elscott and Newbury Living to entrap Plaintiff Christopher to commit an unconstitutional code violation, in that he set up a situation to cause plaintiff Christopher to "break the law" of said unconstitutional codes to better affect an arrest of said plaintiff, though he was not, at the time, breaking any "laws" upon his arrival.  Defendant Thies, is also guilty of conspiring with defendant Lane as Mrs. Lane coached Mr. Theis in what to say on the stand.  Mr. Thief, in light of these facts, then, is guilty of Conspiracy against the civil rights of Plaintiffs Christopher and Elizabeth, in damage, and the plaintiffs, Christopher and Elizabeth, do both ask the court for 2 years of pain, suffering and mental anguish at the hands of Defendant Thies.

d.   As to defendant Newbury Living, Inc., the plaintiffs claim damage in fact that Newbury Living did conspire with Defendant Thies and Defendant Elscott to cause the entrapment of plaintiff Christopher in his "violations" of city codes, in order to affect his arrest on fabricated charges and to get him off of property that did not belong to them, but merely sat in close proximity  to their building.  The plaintiff, Christopher asks the court for 2 years of pain, suffering and mental anguish.

115.   During the time that C.B. served the remainder of his sentence; he would file, with the Polk County Court, Civil Division, an application for post-conviction relief, on October 17th, 2016, while C.B. was still incarcerated. The application was later amended to its final version on December 29th, 2016.

116.   Defendant Linda Lane would appear in the case for post-conviction relief on October 25th, 2016; in defense of the State in this matter.

117.   On February 10th, Defendant Lane emailed C.B., stating she wanted the claimant to call her right away. C.B. waited a couple of days to so, and upon his final call to the office, was then told that Ms. Lane no longer worked or acted in her alleged official capacity for the Polk County Attorney's offices.

118.   After his release, and just two weeks before the trial concerning the post-conviction relief case, C.B. wrote an email to the main address of the Polk County Attorney's office, asking that it be forwarded to Defendant John P. Sarcone himself. In it, C.B. taunted Defendant Sarcone, and told him that the trial concerning his post-conviction relief case was in two weeks, and that he would lose the case if he didn't step on it.

119.   On the same day, within the same hour of Defendant Sarcone receiving this email (as shown in proof by Christopher's email tracking program), an appearance by defendant Jesse Ramirez; who was acting under color of law in his alleged official capacity as an assistant Polk County Attorney for the county of Polk, Iowa; would be handling the case for the state. Defendant Jeanne Vaudt, acting using color of law in her alleged official capacity as a judge employed by and working for the State of Iowa; would be hearing the case.  Filed the same day as the letter was sent to defendant Sarcone; and filed directly after defendant Ramirez's appearance, would be a motion asking that the court order C.B. to recast his application for post-conviction

relief, because, allegedly, the County Attorney's offices did not understand the claimant's initial application, and, of course, wanted to be able to answer it, so he asked for a continuance. According to Iowa's rule of civil procedure, the defense (as named by the claimants) had 60 days with which to answer the initial application, filed on October 16th, 2016 and no later than 60 days following the submission of the amended complaint, that was filed on December 26th, 2016. Defendant Ramirez appeared 4 months after the final complaint was filed; just 2 weeks before the trial date was set. Though C.B. would be dismissed his grievance trying to pull something like this in reverse, due to court rules and time constraints; the court would grant Defendant Ramirez his continuance, and, knowing it would be ordered, C.B. recast the application; even though he knew the claims were clear enough, and that Defendant Ramirez was simply stalling for time.  Note:  Claimant Christopher changed nothing but the positions of a couple of paragraphs and sentences in his recast complaint, for the only purpose of showing that fact.  Attorney Ramirez answered the recast Claim, in around 5 minutes, simply denying every one of the allegations, showing that Mr. Ramirez had been OBVIOUSLY stalling for time, and to set himself a place as the new attorney in charge of a case that should have already been awarded the claimant, C.B.   C.B. claimed that they had ordered an unconstitutionally high bail in the underlying case, had denied C.B. his right to represent himself pro se, and that his stand-by attorney had failed in his duties of co-representation. Defendant Lane, the prosecutor that handled the case in question, and who had originally appeared in the case, had been promoted to Assistant U.S. Attorney's office, just prior to her email to C.B.; in St. Louis, MO. She, of course, would have been the plaintiff's best witness in C.B.'s case, but the court and Mr. Ramirez refused to submit to plaintiff C.B. Ms. Lane's new location, in order to subvert his due process.

120. On March 2nd, 2017, Defendant Jeanne Vaudt would deny three of C.B.'s motions; one requesting videotaping of the proceedings, one asking that subpoenas be served to his witnesses at state expense, and one asking for summary disposition. Summary disposition had been asked for because no one had answered his application (within the time allotted a party to the case to do so), and no one besides C.B. had filed any motions into the case. None of these motions, Defendant Vaudt would claim, were based in fact or law, ruling in most obvious error  C.B. had been initially ruled to be indigent, and because of this, the filing fee for plaintiff Christopher was waived.  The same ruling of indigency should have been enough "fact or law" to grant this similar request as well.  As to C.B.'s request for a video record of proceedings shouldn't need to have any basis in fact or law; it should be an automatic right of any involved party, with the exception noted for high-profile cases and those that might cause danger to a protected party or witness.   The motion to have the case awarded to the claimant needed no basis in fact or law, it should have been addressed and motioned for, then granted by the Court months prior to the date of the trial, simply because no one, until 2 weeks before trial, had been filing in the case for the defense at all.

121. C.B. was then forced to borrow money to have a friend serve subpoenas for him. Out of the eight witnesses for the claimant, only one was able to be served, the one for the Defendant John P. Sarcone.  The rest of CB's witnesses were impossible to serve by any means, as they seemed to be forever and always in court, and naturally, so were they're assistants. As mentioned earlier, Ms. Lane had been promoted, and could not be found at that time. The other plaintiff's witnesses (mostly appointed 'judges'), all  were either not present, or in hearings; and their assistants, of course, were present accordingly. If the Defendants were gone, so were they. If they were in court, so were they. Grant Rogers, the reporter for the

defendant "The Des Moines Register" was a part-timer, and no one would divulge where he lived. Randy Osborn, the Polk County clerk of court, had, by this time, retired, and like every other person on the list as a defendant in this action, has no address listed to be owned by them, in all of Polk County. As for the one to the county attorney/John P. Sarcone, Defendant, the woman who accepted that service attempted to toss the subpoena back at the server, claiming it wasn't a legal serve, even though it most certainly was. She told the server that, in order to serve Defendant John P. Sarcone, she would have to go to the Treasurer's office on 111 Court Avenue; somewhere that Mr. Sarcone didn't do any business, normally. Naturally, just like in the felony case, C.B.'s only served witness would motion to have his subpoena quashed; and, similar to that case also, that motion would be granted. The only witness to testify here would be Mr. Taylor, my own attorney, against me.

122. On July 1st, 2017, Defendant Ramirez would file a brief. C.B. then simply answered the brief to the best of his ability. Several facts of the case in question were blatantly wrong, and C.B. would point these out in his answer. Defendant Ramirez, up until the day of the order some three months later, did not ever correct these "facts." These errors included the actual total amount of bail set on C.B.; that Defendant Lucas Taylor had withdrawn from the case on July 25th, 2016; when in fact, Defendant Blink denied his withdrawal on the record the following day, that Lucas Taylor adequately represented his client in all matters, and more.

123. On September 3rd, 2017, the C.B. received an email from Defendant Jeanne Vaudt, (that had also been sent to defendant Ramirez) stating that both C.B. and Defendant Ramirez had been sent an email by her, prior to this, that had asked them both to file a proposed order for her ruling, and had asked that it be filed no later than September 1st. By this time, C.B. had received numerous emails from both Defendant Vaudt and Defendant Ramirez with no issues, so this was obviously a trick depriving C.B. of any real time to put together a "proposed order," something this claimant has never heard of being required of litigants or defendants in a civil matter. Defendant Ramirez turned his in the next day, though Mr. Ramirez adamantly claimed that he never got notice of this either in his email. Strangely enough, Mr. Ramirez' brief, almost word for word, would morph into their 'proposed order," and was filed the next day, with nearly no changes made. Then, even stranger still, Defendant Ramirez' brief turned proposed order would then morph into the final order, also with no changes made; and, even though I pointed out the obvious errors to the court in my answer to the brief, they remained as they were on the order too, in error. That order was filed in Mid-October, 2017, over three months after the trial. Obviously, there was no real reason for the hurry to get our "proposed orders" nearly a month before this, so that Defendant Vaudt could, essentially, just sign her name to the one submitted by the state and call the matter settled and over with. C.b. believes to be a fact, and this is shown best in the unchanged order, that Defendant Vaudt was simply going through the motions in order to get the case over with; and had absolutely no intention to redress any of the claims made by C.B.; or did she make an effort to review the allegedly maintained evidence, filed by C.B. in the case in question, all of it dismissed for relevance; since none of it is mentioned in any portion of the order that concerned these proceedings.

124. On October 7th, 2017; 92 days after the trial, the order was filed, which was, essentially, the brief/proposed order/order, authored solely by defendant Ramirez and not at all reviewed or changed by Defendant Vaudt; only signed by her almost 3 months later; denying C.B his requested relief on EVERY matter concerning his request for post-conviction relief.

125. The claimant had initially planned to appeal this decision, but, remembering the "justice" he had received in his juvenile case appeal to the appellate courts, and after going through THIS case with no better results, decided it was best that he quit wasting his time seeking true justice that would never be his in the crooked courts of Polk County; and chose instead to file this claim in federal court.

126. The plaintiff, Christopher, brings claim of damage in fact by these remaining defendants:

a. For defendant Ramirez, the plaintiff Christopher claims damage in fact, that Mr. Ramirez used color of law in and through his alleged position as a Polk County Attorney to influence and win in the outcome of the case #PCCE080717, concerning the matter of plaintiff Christopher's claim for post-conviction relief.  Plaintiff Christopher adhered to the Polk County Court's rules of court and followed all instructions and time limitations and did everything legally and properly.  Mr. Ramirez abused his position in his handling of the defense, in that, after engaging in collusion with defendants Vaudt and Sarcone, at a time well after the case should have been dismissed; Defendant Ramirez did abuse the rules of the court by not filing a reply to the claimant's application for post-conviction relief until months after the time limitation expired, and still was able to retain his office as a defendant and a party to the case, regardless of the rules of the court, and regardless of the fact that the plaintiff had filed a motion for summary judgement in the case weeks prior to that, which was never addressed by defendant Vaudt.  Defendant Ramirez also falsified OBVIOUS facts stated in his brief, proven easily by Polk County's own record, as well as in his "proposed order", and the errors were submitted to defendant Vaudt by plaintiff Christopher in an immediate and proper fashion in the form of my answers to them, during the course of the proceedings, and even after these issues were presented to the court, the facts would remain in error when Mr. Ramirez' proposed final order became the final order.  Mr. Ramirez, then, is guilty of conspiracy against the claimants due process and Constitutional rights, as he conspired with both John P. Sarcone and Jeanne Vaudt, first to reinstate his offices as a party in good standing, in opposition to the court's rules, and finally in order to deny plaintiff Christopher his right to post-conviction relief obviously due him; as well as to cover for the blatant errors of the trial of Christopher in case FECR292312, performed by defendants Lane, Blink and Taylor.  Plaintiff Christopher asks for an amount of punitive damages against Mr. Ramirez for one year of pain, suffering and mental anguish.

b. As for defendant Vaudt, the claimant Christopher claims damage in fact, that Ms. Vaudt did absolutely nothing in C.B. case concerning post-conviction relief (PCCE080717) in the matter of FECR292312; but spend some time in trial, and signed the final order, drawn up by and submitted by the defense (Mr. Ramirez).  She did not review or relate anything that pertained to the dismissed and MAINTAINED evidence, nor did she address anything concerning any of the dismissed witnesses; she did not even change anything in the final order, not even errors addressed by plaintiff Christopher in his replies.  Ms. Vaudt quite literally did NOTHING in addressing this case, PURPOSEFULLY, and, if nothing else, should have granted summary judgement to the plaintiff, Christopher, based solely on her very own rule of court, in that the defense, the "State of Iowa" had not filed a single thing, or had not acted until literally 2 weeks before trial, and only because the plaintiff Christopher "poked the beast", so to speak by sending defendant John Sarcone a taunting email.  Ms.

Vaudt, then, is guilty of conspiring with those defendants of the Polk County Attorney's offices, i.e. Mr. Sarcone and Mr. Ramirez, against the due process, civil rights, and Constitutional rights of claimant Christopher.  Plaintiff Christopher asks for punitive damages against Ms. Vaudt for one year of pain, suffering and mental anguish.

c.  For Defendant Lucas Taylor, who conspired with Defendants Blink, Lane and Munson to bring a false justice and false and unsubstantiated charges against plaintiff Christopher, in order to get him put away in the Polk County Jail and on probation, so that Polk County as a whole could effectively "leash" plaintiff Christopher to control his future actions; by and through his inactions in his co-representation/representation of his "client"; in depriving him of his chance at a mistrial, depriving him of a bail reduction hearing, depositions and other critical services that are available to those charges with felonies; depriving him of his appeal, and, essentially, depriving him wholly of his entire defense; and of the defendant's alleged 'Expertise' as an expert in representing felony defendants; for purposefully NOT attending what was probably the most important hearing there could have been in the case, where defendant Blink excused over 30 witnesses and over 200 pieces of critical and relevant exhibits to the case, by, without permission, excusing the remainder of plaintiff Christopher's witnesses for the defense; and not doing his client/Co-council right in his representational capacity, and effectively, in all of his actions, did conspire with other of the afore-mentioned defendants to deprive Plaintiff Christopher of his due process and Constitutional rights; and did conspire with Defendant Kelly to deprive Christopher of his 6th Amendment right to defend himself without appointed representation; hereby asks this court for 2 years of mental anguish and pain and suffering from Mr. Taylor.

**RELIEF**

The claimants request the court to grant them relief, based on the individual claims of damage in fact, stated throughout the claim made by these plaintiffs, following the last or nearly last instances of said damages by each of the afore-mentioned defendants individually, and ask the court to also grant this additional relief:

1.  That this court order that E.B.'s rights to parent be restored to her without fail, and as quickly as is humanly possible (as if she didn't have these rights anyway, and as if any judge or court of law could rightfully or judiciously deprive her of them; ESPECIALLY without legal cause, reason, charge, special or extenuating circumstances) concerning T.B, her rightful biological property. The claimant would ask to have the child returned to her possession, post haste.

2.  That an award of punitive damages be given the family for one to four years of mental anguish (as described in the above claimed damage in fact for each defendant named in this claim), malicious prosecution, libel, slander, false imprisonment, fraud, pain and suffering; and finally, for the total and vindictive defamation of both of the claimants' characters; and that this amount be taken from all those involved, and also relief in the form as is described in all of the aforementioned claims of damage; per the years and number of years stated in said claims; per each defendant so individually named.

3. The claimant Christopher, in light of the facts related in this claim; wishes the court to order that C.B.'s record be expunged of all the alleged criminal charges and crimes brought against plaintiff C.B. over the period of the last 3 years, including any record of arrests, charges or convictions.

4. The claimants pray this court find Gary Bellinghausen to be solely in default of his contract and order the defendant Gary Bellinghausen to pay the amount he willingly contracted and agreed to; concerning his and his partner's unlawful entry. without invitation, into the claimant's  home on January 21st, 2016.

5. That injunctive relief be given the claimant Christopher, to keep defendant John P. Sarcone and his offices from terrorizing the claimants, by calling the offices of the FBI/Homeland Security, or whatever Government or law-enforcement offices he's contacting all over the country; and in so doing, is attempting to have claimant Christopher investigated and arrested.

6. Lastly, the claimants would hope that the court would see the obvious crimes of Defendant Sarcone and those defendants who are acting with him using color of law to needlessly prosecute people he doesn't like or who are attempting to expose the wrong he is doing to families in Polk County, Iowa; and see his hand through the actions of his "assistants" in all the afore-mentioned cases - Stephanie Brown, Kevin J. Brownell; Kevin Bell, Jesse Ramirez and Linda Lane.  These claimants would like this court to file charges against Mr. Sarcone for Racketeering and being a major player in an organized and concerted effort to kidnap children from poor parents, who do not obviously know the "law" and do not generally have the knowledge or the wherewithal to fight against them or afford a real attorney.  Defendant Sarcone has obviously conspired against the claimant's free speech rights and other rights mentioned throughout the claim, and attempted to limit or eliminate exposure of what Claimant C.B. has alleged that he is involved in and for what he has done and continues to do in damaging these claimants and what little remains of their family.

In conclusion, the claimants, who, unlike those who charged against the claimant Christopher in all the charges brought in criminal matters involving C.B. and both the claimants in all the above listed juvenile matters; do in fact, and without fear or worry of counterclaim, do come forth and swear to be the injured parties in this claim; both living breathing state nationals of the republic; pray the court not be lenient on those listed criminal defendants for their collective criminal and lawless actions against our family. An example must be made of those who feel that they can abuse their power and positions to do whatever they want, whenever they want, to whomever they wish; regardless of their oaths, their bonds, 'The Law', the Constitution of the United States of America; and their promise to Iowa that they would support and uphold the rights of the Constitution, concerning their living citizens.

The claimants also seek the court to provide for this matter to be heard by an impartial jury of our peers, as is our right.

Christopher (Bruce), the living man                    Date: _____

Sui Juris, All rights reserved
701 S. Duluth Avenue, Apt. 1
Sioux Falls, SD 57104
605-271-3377
cbstraighteight@gmail.com


Elizabeth (Bruce), the living woman          Date: _____
Sui Juris, All rights reserved
Same Contact Information


**Certificate of Service**

This document will be served upon the defendants utilizing certified mail, upon receipt of summons.